OPINION
{¶ 1} Appellant, James T. Conway, III ("appellant"), appeals from the judgment of the Franklin County Court of Common Pleas, which dismissed appellant's petition for post-conviction relief.
 {¶ 2} The underlying criminal case against appellant arises from events that occurred on January 18, 2002. On that night, appellant, his brother, Jeffrey Conway, and many others were involved in a fight at a Columbus club called Dockside Dolls. After club personnel quelled the fight, appellant's brother stated that he had been cut and that Mandel Williams had done it. Thereafter, appellant obtained a .45 caliber weapon and began firing toward Williams. Jason Gervais, a club patron who had not been involved in the fight, walked or was pulled in front of Williams. Gervais and Williams fell to the ground. Gervais was shot three times from behind, and he died from his wounds. Williams also was shot three times, but survived.
 {¶ 3} A grand jury returned a three-count indictment against appellant. Count 1 charged appellant with the aggravated murder of Gervais and carried a death penalty specification. Count 2 charged appellant with the attempted murder of Williams. Count 3 charged appellant with having a weapon under disability.
 {¶ 4} A jury trial began on January 17, 2003. On January 31, 2003, the jury returned guilty verdicts on all counts and specifications. On February 6, 2003, the jury returned a verdict recommending that appellant be sentenced to death. On February 18, 2003, the trial court sentenced appellant to death. Appellant timely filed a notice of appeal to the Ohio Supreme Court, and his case on direct appeal is currently pending before that court.
 {¶ 5} On April 2, 2004, appellant filed a petition for post-conviction relief under R.C. 2953.21. The State of Ohio ("appellee") answered and moved to dismiss the petition. On December 27, 2004, the trial court issued its decision and entry granting appellee's motion to dismiss. This appeal followed.
 {¶ 6} Appellant has submitted a single assignment of error:
THE TRIAL COURT ERRED IN DISMISSING APPELLANT'S POST-CONVICTION PETITION WHERE HE PRESENTED SUFFICIENT OPERATIVE FACTS TO MERIT REVERSAL FOR A NEW TRIAL AND SENTENCING HEARING OR ALTERNATIVELY MERIT AN EVIDENTIARY HEARING AND DISCOVERY.
 {¶ 7} Initially, we note that appellant's grounds for relief in support of his assignment of error do not include every ground for relief he presented to the trial court in support of his petition. With respect to the trial court's dismissal of any such additional grounds for relief, appellant is deemed to have waived any error, and we will not address the propriety of their dismissal. As to the grounds appellant has presented on appeal, however, for the reasons we detail below, we reject appellant's claims.
 {¶ 8} Appellant's right to post-conviction relief arises from R.C. 2953.21(A)(1)(a), which provides:
(A)(1)(a) Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States, * * * may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.
 {¶ 9} This post-conviction relief process is a collateral civil attack on a criminal judgment, not an appeal of the judgment. State v. Calhoun
(1999), 86 Ohio St.3d 279, 281. It is a means to reach constitutional issues that would otherwise be impossible to reach because the trial court record does not contain evidence supporting those issues. State v.Murphy (Dec. 26, 2000), Franklin App. No. 00AP-233. Appellant does not have a constitutional right of post-conviction review. Rather, post-conviction relief is a narrow remedy that affords appellant no rights beyond those granted by statute. Calhoun at 281. A post-conviction petition does not provide appellant a second opportunity to litigate his conviction. State v. Jackson (1980), 64 Ohio St.2d 107 ("Jackson I").
 {¶ 10} From the outset, appellant characterizes appellee's motion to dismiss his petition as a motion pursuant to Civ.R. 12(B)(6). Since the court considered matters outside the pleadings, appellant argues, dismissal under Civ.R. 12(B)(6) was not appropriate, and the court should have treated the motion as a motion for summary judgment under Civ.R. 56. We disagree with appellant's characterization of the post-conviction proceedings.
 {¶ 11} It is well-established that a post-conviction proceeding is civil in nature and that the Rules of Civil Procedure generally govern the proceeding. State v. Yuen (Sept. 7, 1999), Franklin App. No. 99AP-55. "However, a post-conviction proceeding is a statutory creation controlled by the statute's procedural requirements when those requirements conflict with the civil rules." Id., citing State v. Gipson
(Sept. 26, 1997), Hamilton App. No. C-960867. Unlike Civ.R. 12(B)(6), R.C. 2953.21 requires the court to consider evidentiary materials beyond the pleadings. For example, R.C. 2953.21(C) requires the court to consider, among other things, affidavits that may support the petition. Thus, the trial court appropriately adhered to statutory requirements for considering appellant's petition and did not err by refusing to consider appellee's motion under Civ.R. 56. See State v. Zerla (Sept. 25, 1997), Franklin App. No. 96APA11-1583, certiorari denied (1998), 525 U.S. 859, and cases cited therein.
 {¶ 12} We also disagree with appellant's assertion that he is entitled to conduct discovery. This court has addressed this issue previously and has determined that there "is no requirement of civil discovery in post-conviction proceedings." State v. Samatar, Franklin App. No. 03AP-1057, 2004-Ohio-2641, at ¶ 23, citing State ex rel. Love v.Cuyahoga Cty. Prosecutor's Office (1999), 87 Ohio St.3d 158, certiorari denied (2000), 529 U.S. 1116.
 {¶ 13} Appellant also argues that the court erred by failing to conduct an evidentiary hearing. A petitioner seeking post-conviction relief is not automatically entitled to an evidentiary hearing. Calhoun
at 282. The trial court "shall determine whether there are substantive grounds for relief" before granting a hearing on a post-conviction petition. R.C. 2953.21(C). Pursuant to R.C. 2953.21(C), a trial court properly denies a post-conviction petition without an evidentiary hearing if the petition, supporting documents, and court record "do not demonstrate that petitioner set forth sufficient operative facts to establish substantive grounds for relief." Calhoun at 291.
 {¶ 14} A trial court may also dismiss a petition for post-conviction relief without holding an evidentiary hearing when the doctrine of res judicata bars the claims raised in the petition. State v. Szefcyk
(1996), 77 Ohio St.3d 93. "Res judicata is applicable in all postconviction relief proceedings." Id. at 95. Under the doctrine of res judicata, a defendant who was represented by counsel is barred from raising an issue in a petition for post-conviction relief if the defendant raised or could have raised the issue at trial or on direct appeal. Id.; State v. Reynolds (1997), 79 Ohio St.3d 158, 161.
 {¶ 15} For a defendant to avoid dismissal of the petition by operation of res judicata, the evidence supporting the claims in the petition must be competent, relevant, and material evidence outside the trial court record, and it must not be evidence that existed or was available for use at the time of the trial. State v. Cole (1982), 2 Ohio St.3d 112, syllabus; State v. Lawson (1995), 103 Ohio App.3d 307, 315.
 {¶ 16} We apply an abuse of discretion standard when reviewing a trial court's decision to deny a post-conviction petition without a hearing.State v. Campbell, Franklin App. No. 03AP-147, 2003-Ohio-6305, citingCalhoun at 284. An abuse of discretion connotes more than an error of law or judgment; it entails a decision that is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 17} Here, appellant contends that the court abused its discretion as he set forth sufficient operative facts to support his ineffective assistance of counsel claims, thereby warranting an evidentiary hearing. The United States Supreme Court established a two-prong test for ineffective assistance of counsel. Strickland v. Washington (1984),466 U.S. 668. First, the defendant must show that counsel's performance was outside the range of professionally competent assistance and, therefore, deficient. Id. at 687. Second, the defendant must show that counsel's deficient performance prejudiced the defense and deprived the defendant of a fair trial. Id. Moreover, a defendant must overcome a strong presumption that counsel's actions fall within the range of reasonable professional assistance. Id. at 689.
 {¶ 18} Appellant's first ground for relief is that his trial counsel were ineffective because they did not call an expert to testify regarding two issues relating to a .45 caliber weapon: (1) appellant's alleged statement to a state's witness that a bullet from the .45 caliber weapon could travel through Gervais and hit Williams; and (2) the trigger capability of a .45 caliber weapon. In support, appellant offers the affidavit testimony of John Nixon, who opined that the prosecution's experts had addressed inadequately the penetration potential and trigger characteristics of the weapon. As to each point, however, we disagree with appellant's assertion that he presented operative facts sufficient to show that his counsel were ineffective for their failure to present such testimony.
 {¶ 19} At trial, the state presented the testimony of Ronnie Trent, a former jailhouse informant, who testified as to what appellant told him about the events at Dockside Dolls:
A. [by Mr. Trent] * * * [H]e just started firing, said the guy was running towards the back of the building, he started firing, and he pulled some guy in front of him, but he said, it's .45, you know, it would go through him, so he kept shooting.
Q. [by appellee's counsel] It was .45 and would go through him, so he kept shooting?
A. Correct.
(Tr. at 1820.)
 {¶ 20} Later, Trent repeated the same statement:
A. [by Mr. Trent] * * * The guy was running away from him, he started shooting at him. He pulled somebody in front of him, but he said he kept shooting anyway, it's a .45 and it will go through both of them.
(Tr. at 1876.) In addition, as appellant notes, the state also made numerous references to this testimony during closing arguments.
 {¶ 21} In his affidavit, Mr. Nixon opines that a .45 caliber weapon "has poor penetration performance, and the majority of the time it will not completely penetrate a human torso." (Exhibit C at 9.) However, expert testimony on this issue would have been irrelevant. The question whether a bullet went through Gervais to hit Williams was not at issue in the case. Rather, the issue was appellant's mental state at the time he fired the shots, and the state offered Trent's testimony as support for its argument that appellant intended to kill Williams. During the state's closing argument, counsel stated:
Remember what Ronnie Trent said that James Conway told him. I had a .45. That's a big gun. I had a .45 and I knew that it would go through the white boy and get to Mandel. That makes sense, shows you what James Conway's mental state was, what his purpose was.
(Tr. at 2620.) Because the validity of appellant's alleged statement was not at issue, appellant has not presented evidence sufficient to question counsel's decision not to offer expert testimony on this point. See State v. Combs (1994), 100 Ohio App.3d 90, 98.
 {¶ 22} Nor does appellant offer evidence sufficient to question counsel's decision not to submit expert testimony regarding the trigger capability of a .45 caliber weapon. As an initial matter, we note that a "decision by defense counsel not to call an expert witness generally will not sustain an ineffective assistance of counsel claim." State v. Price
(Dec. 31, 2001), Franklin App. No. 00AP-1434, quoted in State v.Jackson, Franklin App. No. 01AP-808, 2002-Ohio-3330 ("Jackson II"), at ¶ 62. Moreover, any expert testimony concerning trigger capability would have been limited to general information because the actual murder weapon was never recovered or otherwise used at trial. Here, defense counsel initially tried to qualify Dr. Jeff Hilson as a firearms expert. When the court asked defense counsel: "What is he going to testify exactly * * * what are you going to put him on for?" defense counsel replied: "Just as to how fast the weapon operates. * * * Empty it in less than two seconds." (Tr. at 2199-2200.)
 {¶ 23} At that point, the court did not allow Dr. Hilson to testify because the evidence had not yet established the type of weapon used. However, after evidence identified the weapon more specifically, the court stated that defense counsel could put on the firearms expert. Defense counsel did not do so.
 {¶ 24} Appellant now offers Nixon's affidavit and report as support for the conclusion that the type of weapon used by appellant was easy to discharge. From that conclusion, he asserts grounds for a hearing to determine whether counsel were ineffective for not introducing such evidence. We disagree.
 {¶ 25} It is clear from defense counsel's closing argument that the rapidity of the gunshots was key to the defense. Essentially, the defense argued that appellant was aiming at Williams, but was shooting low to the ground (no more than 30 inches off the ground) in order to stop him, not kill him. Although Gervais and Williams had wounds higher on their bodies, the defense argued, that was due to them falling. According to the defense, because their fall happened quickly, and because the shots were fired rapidly, the location of the wounds is consistent with appellant's assertion that he continued to fire low to the ground and did not intend to kill Williams. Using a diagram showing the movements of Gervais and Williams, and the entrance of the wounds, defense counsel summarized this theory in closing:
What do we know for sure happened there? We know for sure that Jeff Conway was severely cut. We know for sure now that Mandel Williams did it. We know for sure that Jim Conway shot and he shot at Mandel Williams. We know for sure that Mandel Williams was coming back towards the Defendant because of the entrance areas. We know that Mandel and the deceased, Jason, either got tripped up kind of funny or Jason was used as a human shield. Why? Because this space underneath here is where Mandel was. Now, isn't that just coincidence if he didn't use him as a shield? Isn't that? Right there, and under here, right here, pulling him down. Right there, pull him down more. How fast does that happen? How fast does that happen? That's what happened in this case. And because it's low, we know that is quick, that's a fact, whoosh, that's quick. And that low indicates no intent to kill, only to stop, and we don't have a case here.
(Tr. at 2596-2597.)
 {¶ 26} There was a great deal of evidence to support appellant's assertion that he fired the shots very rapidly. Damien LeCaptain testified that he heard at least four rapid shots, which he agreed were as fast as a trigger can be pulled. (Tr. at 1162, 1195.) Earl Larimore testified that he heard six to eight gunshots, which he described as rapid. (Tr. at 1613, 1618.) Jeff Conway, appellant's brother, testified that the shots were rapid. (Tr. at 2108.) And appellant testified that he fired the shots "as fast as I could pull the trigger." (Tr. at 2240.) He also stated that the shots were "almost instant[.]" (Tr. at 2287.) The only witness who offered evidence that one could characterize as remotely inconsistent was Troy A. Ankrum. Ankrum testified that he heard about seven shots, which he described as "controlled, steady, constant firing." (Tr. at 1304.) But Ankrum agreed that the shooting took only about seven seconds. (Tr. at 1305.) Further, the state never disputed that appellant fired the shots rapidly. Given so much evidence supporting appellant's assertion that he fired rapidly, and the lack of evidence that was truly contrary, any additional evidence regarding the ease with which appellant could have pulled the trigger would have been cumulative. In the end, the evidence was sufficient for the defense to present its theory of the case, and appellant has not presented evidence sufficient to question defense counsel's decision not to present alternate or cumulative evidence. See Campbell; Combs at 98. Therefore, we reject appellant's first ground for relief.
 {¶ 27} Appellant's second ground for relief is defense counsel's failure to present testimony from lay and expert witnesses concerning the impact of American-Appalachian culture and influences on him. Although appellant does not state explicitly when these witnesses would have testified, we assume from the context of these arguments that appellant believes counsel should have presented these witnesses during the sentencing phase. Also, in his fifth ground for relief, appellant asserts that defense counsel failed to investigate and/or provide mitigation.
 {¶ 28} Generally, counsel's decision as to what mitigating evidence to present during the penalty phase of a capital trial is a matter of trial strategy. State v. Keith (1997), 79 Ohio St.3d 514, 530, certiorari denied (1998), 523 U.S. 1063. Defense counsel has a duty to investigate mitigating circumstances in order to make informed tactical decisions about what information would be most helpful to his or her client.Jackson II, citing State v. Johnson (1986), 24 Ohio St.3d 87, 90. The decision to forego the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel.Johnson at 91.
 {¶ 29} Further, decisions regarding what witnesses to call fall within trial strategy and, absent prejudice, generally will not constitute ineffective assistance of counsel. State v. Hessler, Franklin App. No. 01AP-1011, 2002-Ohio-3321. To demonstrate prejudice, a petitioner must show not only that there was mitigating evidence counsel failed to present, but, also, "there is a reasonable probability that the evidence would have swayed the jury to impose a life sentence." Keith at 536. We find no such evidence here.
 {¶ 30} Before trial, defense counsel took a number of steps to strengthen any defense presentation that might be necessary at sentencing. The defense filed three pre-trial motions to limit the prosecution's evidence and/or to ensure the defense's submission of all relevant evidence. The defense also hired a psychologist and a mitigation specialist, both of whom were granted permission to consult with appellant as early as August 2002. And defense counsel's fee applications show more than 40 out-of-court work hours between the guilty verdict on January 31, 2003, and the sentencing hearing on February 5, 2003.
 {¶ 31} Before the sentencing hearing began, in the presence of appellant, and on the record, one of appellant's lawyers spoke to the court regarding his preparation. Counsel stated the following:
MR. RIGG: Your honor, there are some issues involving my client. I've talked to him yesterday twice in the jail regarding this case. We also would like a couple minutes.
Mr. Crates, our mitigation specialist, wants to talk to him about his unsworn statement. We let him kind of sleep on it last night. There was some issues yesterday that he did not want to present mitigation, although after the discussions with him, I believe he does want to proceed with mitigation.
* * *
I think it was the 2nd of February, Sunday night I had discussions with Mr. Crates that my client's family wanted to hire another attorney, postpone this mitigation, postpone the sentencing phase. I approached the Court yesterday and also on Monday with some of the problems we were having. My client wanted us off the case. Then we were informed that Mr. Binning was going to represent him and than not represent him. I believe he still wants the Defense team * * * to go forward with this mitigation. However, I believe he still has some questions regarding continuance of the mitigation and to hire separate counsel for this. And I believe he has some issues he wants to discuss and put on the record.
We are prepared to go forward, although it would be a lot better for the Defense if we would have the cooperation of my client's family. He has [a] very extended family that were not allowed to sit in through the trial because we may use them for mitigation. And things fell apart Friday evening after the verdict, which happens quite frequently. However, I've never had a situation where the client's family absolutely refuses to participate in meetings. I had yesterday and Monday afternoon scheduled to meet with family, whoever wanted to testify on my client's behalf to testify. The only person I talked to was Mr. Crates and our psychologist, Dr. Eshbaugh. And so it's been kind of difficult, extremely difficult to prepare for mitigation, although I did spend a lot of time yesterday going over questions I would ask with Mr. Crates without the benefit of my witnesses being available.
(Tr. 2749-2751.)
 {¶ 32} After an extended discussion, which included appellant, the court denied appellant's request for new counsel in light of the late notice and the need to keep the jury empanelled. The court also stated:
* * * The attorneys who the Court has appointed for you have been preparing mitigation, and as part of preparing for the trial phase have been given money by the Court to hire people for the preparation and have stated they're ready to go forward. I don't — these attorneys have worked very diligently on this case. I've seen their work product throughout the length of this trial. There's nothing this Court sees that they have not done on your behalf.
(Tr. 2767.)
 {¶ 33} The court did, however, inquire thereafter into specific issues regarding trial counsel, issues not before us here.
 {¶ 34} At the sentencing hearing, defense counsel told the jury that he would present only a couple of witnesses and the hearing would be short. He referred to the evidence that had been presented in the culpability phase of the trial. From our review, we note that potentially mitigating evidence could include appellant's own testimony concerning his upbringing. In particular, appellant testified that his father had been imprisoned during part of appellant's childhood and that appellant's mother relied on him to look after his siblings. One could also consider appellant's testimony that his actions toward Williams were the result of appellant's attempts to protect his brother. While any intent to kill Williams legally transferred to Gervais, appellant testified that he intended only to stop Williams and did not see Gervais.
 {¶ 35} Defense counsel presented the testimony of appellant's parents, Jim and Jan Conway. As appellee pointed out to the jury, much of their testimony was hardly mitigating. In essence, they testified that appellant was "a normal kid, happy kid[.]" (Tr. at 2797.) He did very well in school, took advanced classes, and participated in extracurricular activities. He helped with this brother and sister. He was the father of two children, with whom he had a good and loving relationship. His parents paid for him to go to college, and he had been employed.
 {¶ 36} Appellant also presented an unsworn statement. Appellant apologized to everyone involved, including the Gervais family. He asked the jury to understand that "it wasn't a premeditated thing, it was something that just occurred and there's nothing that I can do to change that, or believe me, I would do that, not just for the Gervais family, for my family, too." (Tr. at 2825.)
 {¶ 37} Defense counsel presented no other witnesses and submitted as exhibits just two photographs depicting appellant when he won the lottery. In response, the state offered no witnesses, but did offer a number of exhibits related to the crime.
 {¶ 38} Both of appellant's counsel offered closing arguments. Mr. Rigg asked the jury to consider the 25-years-to-life sentence, noting that appellant would be nearly 50 years old when he became eligible for parole. He stressed that the decision of only a single juror could prevent the death penalty. Rigg acknowledged that appellant had not used the tools he had been given in life, but asked the jurors to consider that appellant had lost his temper and was under duress when he committed the murder. Mr. Suhr asked the jury to consider the evidence relating to self-dense and specifically to consider whether his brother's stabbing provoked appellant.
 {¶ 39} In support of his arguments that defense counsel should have done more to prepare and/or present mitigation evidence, appellant offers numerous affidavits, primarily from family members. As detailed above, however, defense counsel described at length the lack of cooperation from appellant and his family after the jury's guilty verdict, and even counsel's success at persuading appellant to allow the submission of any
mitigation evidence. Appellant's submission of different or additional evidence from family members willing to cooperate at the post-conviction proceeding does not overcome the record evidence clearly establishing the diligent preparation by counsel. The pre-trial motions, time records, and trial transcript show that counsel prepared thoroughly, consulted with a mitigation specialist, and were fully engaged on their client's behalf. See Campbell; Murphy; Combs.
 {¶ 40} Nor is this evidence sufficient to question defense counsel's failure to present a cultural expert. Appellant's evidence includes articles and information about Franklinton, the Columbus neighborhood where appellant grew up; an "Encyclopedia of Southern Culture"; affidavits from a cultural expert concerning other criminal defendants; and court decisions in other capital cases. We question, first, whether some of this evidence would even have been admissible. Evidence that "does not meet a minimum level of cogency" will not compel a hearing.Combs at 98, citing Cole at 115. "For example, evidence in the form of magazine articles that are irrelevant to the issues in the petition will not overcome res judicata." Combs at 98. Second, this court has questioned the usefulness of cultural stereotypes in sentencing. SeeMurphy. Appellant has presented no evidence that connects this southern culture evidence to him specifically. As the trial court stated in its dismissal of appellant's petition, there is no evidence as to what a cultural expert would or could have said on behalf of appellant, or that such testimony would have been admissible.
 {¶ 41} To the extent that appellant is proposing to argue that race was a factor in the murder, the evidence in the culpability phase of the trial showed to the contrary. While numerous witnesses testified that the fight at Dockside Dolls arose from racial tension between appellant and his associates, and black patrons at the club, neither appellant nor his brother admitted to making, or even hearing, racial slurs that night.
 {¶ 42} Further, to the extent that appellant is proposing to argue that his cultural upbringing resulted in a propensity toward violence, we note that the affidavits do not support such an argument. Rather, these affiants describe their shock at hearing that appellant had been arrested for murder. They describe appellant as a good student, a good father, and a supportive brother and son in a close-knit family. Appellant took care of his siblings, was helpful to other family members, and "doesn't have a mean bone in his body[.]" (Exhibit H at ¶ 14.)
 {¶ 43} These affidavits do present a negative picture of appellant's father and his propensity toward violence. However, the evidence concerning the elder Conway's criminal record and absence from the family came out during the culpability phase and the sentencing phase. Further, appellee's cross-examination during the sentencing phase showed that, while appellant's father had been in prison and absent from the family while appellant was very young, his father had a stable work history more recently, had supported appellant's school activities, and had remained married to appellant's mother.
 {¶ 44} In the end, we acknowledge that the defense presented relatively little evidence at mitigation. This is not, however, a case where counsel simply abdicated their responsibility to their client, thus necessitating an evidentiary hearing to determine the effectiveness of their representation. Cf. State v. Scott (1989), 63 Ohio App.3d 304
(remanding to the trial court for a hearing on counsel's effectiveness);Johnson (finding counsel ineffective and reversing death sentence). Rather, the record firmly establishes counsel's diligent preparation and good-faith efforts at representation, and appellant's post-conviction presentation of additional or different theories of mitigation does not present facts sufficient to show that his counsel were ineffective. Therefore, we reject appellant's second and fifth grounds for relief.
 {¶ 45} In his third ground for relief, appellant argues that the state violated its duty of disclosure for failing to disclose a statement made by Ronnie Trent during a May 26, 2002 interview. The statement, appellant argues, was, essentially, that appellant knew that a bullet from a .45 would go through Gervais and hit Williams. In support, appellant offers a transcript of the interview. The following dialogue between investigators and Trent took place:
TRENT: * * * Jimmy said Emanuel [Williams] pulled Jarvis [sic], a white guy named Jarvis in front of him, Jimmy said he just kept shooting.
FLOYD: Did he know Jarvis?
TRENT: No, he just said he, he said Emanuel pulled somebody in front of him, he said, fuck it I got a 45, I'm just going to keep shooting. So he kept shooting, he seen both of them go down, he got his crew together, they got in their cars and left.
(Exhibit B at 3.)
 {¶ 46} Appellant argues that the state did not disclose this statement prior to trial. Alternately, in his fourth ground for relief, appellant argues that, if the state did disclose the statement, then defense counsel were ineffective for failing to prepare for Trent's testimony. As the nature of appellant's alternate grounds for relief suggest, appellant cannot provide evidence to support either claim.
 {¶ 47} First, we disagree with appellant's characterization of Trent's statement. Trent's statement before trial that appellant stated: "I got a 45, I'm just going to keep shooting[,]" is not the same as Trent's testimony at trial that appellant stated: "[I]t's .45, you know, it would go through him" or "it's a .45 and it will go through both of them." (Exhibit B at 3; Tr. at 1820, 1876.) In the May 2002 interview, Trent simply did not state that appellant knew a bullet could go through Gervais and hit Williams.
 {¶ 48} Second, appellant's claim of prosecutorial misconduct would necessarily depend on evidence that the state failed to disclose the statement. State v. Johnston (1988), 39 Ohio St.3d 48, paragraph four of the syllabus. Appellant has provided no such evidence here. As to whether record evidence supports a claim of prosecutorial misconduct, appellant may bring such a claim on direct appeal, and the doctrine of res judicata bars the claim here. For these reasons, we reject appellant's third ground for relief.
 {¶ 49} Moreover, appellant has not provided evidence sufficient to require a hearing on the question whether counsel had the statement beforehand, but failed to prepare. As we have already concluded, appellant's evidence is insufficient to support his claims that defense counsel were ineffective with respect to preparing for or responding to Trent's testimony as to appellant's statement. However, because our discussion of appellant's eighth and ninth grounds for relief, which we address below, shed additional light on this issue, we will return to appellant's fourth ground at a later point in our decision.
 {¶ 50} Appellant's sixth ground for relief is that administration of the death penalty by lethal injection violates his constitutional rights. However, as the trial court found, the doctrine of res judicata bars appellant's claims because appellant can raise such claims on direct appeal. In addition, the Ohio Supreme Court has rejected such a claim. SeeState v. Carter (2000), 89 Ohio St.3d 593, 608. Therefore, we reject appellant's sixth ground for relief.
 {¶ 51} Appellant's seventh ground for relief is that defense counsel failed to peremptorily strike Juror Finegold because he favored the death penalty. Defense counsel sought to strike Finegold for cause, but the court denied it. Defense counsel did not thereafter use a peremptory strike against Finegold, and appellant now claims that the failure to do so rendered defense counsel's representation ineffective.
 {¶ 52} We begin with the principle that voir dire is largely a matter of strategy and tactics. Keith at 521. Most important here, decisions on the exercise of peremptory challenges are a part of that strategy. Statev. Goodwin (1999), 84 Ohio St.3d 331, 341, certiorari denied, 528 U.S. 846. Trial counsel, who observe the jurors firsthand, are in a much better position to determine whether a prospective juror is qualified to be on the panel. Keith at 521.
 {¶ 53} In support of his argument that counsel should have used a peremptory strike against Finegold, appellant offers Finegold's juror questionnaire, which includes defense counsel's handwritten notes. On his questionnaire, Finegold had checked "strongly favor" as representing his views on capital punishment. (Exhibit X at 19.) The following exchange occurred with the prosecution:
MS. PRITCHARD: * * * Mr. Finegold, what are your thoughts?
PROSPECTIVE JUROR FINEGOLD: I'm in favor of the death penalty. Again, it would have to be a clearcut decision that the person was guilty. But if they were actually guilty, my feelings go to the victim and I would feel that I would have no problem signing my name to a death sentence.
MS. PRITCHARD: Okay. And if we get to that second phase, the jury would have already determined he's guilty and that would have been by proof beyond a reasonable doubt. Now, when we get to the second phase, do you want to hear all the information, do you want to hear things about the Defendant before making a decision?
PROSPECTIVE JUROR FINEGOLD: Sure, that's important.
MS. PRITCHARD: And you're willing to consider all that and weigh all that before you would decide?
PROSPECTIVE JUROR FINEGOLD: Correct.
(Tr. at 525-526.)
 {¶ 54} Defense counsel also engaged in a lengthy dialogue with Finegold concerning his expressed views on capital punishment. In particular, defense counsel asked about Finegold's view that the death penalty is a more economical option than life in prison.
MR. SUHR: Okay. Now suppose, though, that you were thinking in this sentencing phase, gee, I'm really undecided about this mitigation stuff, whether it, whether the aggravation went beyond a reasonable doubt, overcomes the mitigating factors, but, you know, I'm really undecided about some life offense and death, but, you know, since the life offense is going to cost me as a taxpayer, maybe I ought to give death.
PROSPECTIVE JUROR FINEGOLD: No, `cause the question still becomes beyond a reasonable doubt.
MR. SUHR: Right.
PROSPECTIVE JUROR FINEGOLD: Once that issue is out of the way, I feel it's clearcut once all the issues are out of the way.
* * *
MR. SUHR: * * * Somebody, for instance, to serve life without parole would be to your way of thinking not much of a penalty for this kind of thing?
PROSPECTIVE JUROR FINEGOLD: On the full board, a hundred percent guilty, no mitigating sentence, correct.
MR. SUHR: Okay. Now, you mention that if everything was found beyond a reasonable doubt, then death would be the appropriate penalty?
PROSPECTIVE JUROR FINEGOLD: Um-hmm.
(Tr. at 538-540.)
 {¶ 55} Beyond this transcript evidence, appellant offers Finegold's questionnaire to show that defense counsel should have used a peremptory challenge to remove Finegold from the jury, and appellant points specifically to counsel's notes on the questionnaire. However, counsel's notes offer nothing more than the trial record offers. The notes match Finegold's testimony, suggesting that defense counsel was simply taking notes on what Finegold said. Therefore, res judicata bars this claim and the trial court properly dismissed it.
 {¶ 56} Moreover, the remainder of the questionnaire provides insight into why defense counsel might have wanted to keep Finegold on the jury. He had been a jury foreman in a prior case. He had been arrested and "caged." (Exhibit X at 18.) He was a gun enthusiast, and he believed that drugs ought to be legalized. Under these circumstances, the questionnaire does not provide support for second-guessing defense counsel's tactical decision to keep Finegold on the jury, and we reject appellant's seventh ground for relief.
 {¶ 57} Appellant's eighth and ninth grounds for relief are that defense counsel failed to investigate, prepare, and present evidence that would have undermined the credibility of Ronnie Trent. In particular, appellant argues that defense counsel should have discovered that the mother of the victim in the gross sexual imposition case against Trent objected to the deal prosecutors made with Trent. The mother's testimony, appellant argues, "would have undermined Trent's credibility, as was done in Appellant's second capital trial."
 {¶ 58} Our review, however, shows that defense counsel did prepare for Trent's testimony and sought, at every turn, to preclude his testimony altogether or to limit its impact. On November 29, 2002, appellant moved to suppress Trent's testimony and evidence from Trent's conversations with appellant, on multiple grounds. In response, appellee specified the voluminous records defense counsel had received regarding Trent's testimony. The court heard arguments on the motion on January 10, 2003. Ultimately, the court suppressed the use of Trent's testimony and other related evidence in some respects.
 {¶ 59} During the trial and prior to Trent's testimony, the defense again objected and raised additional grounds to preclude Trent's testimony. The defense objected during Trent's testimony, and objected during appellant's testimony concerning the tapes of conversations between appellant and Trent.
 {¶ 60} On direct examination, the state asked Trent about his criminal past, including his conviction for gross sexual imposition. The following exchange occurred:
Q. [by Ms. Pritchard] And, Mr. Trent, most recently, you were in jail on a case; correct?
A. [by Mr. Trent] Yes, ma'am.
Q. Do you remember when you were arrested?
A. October the 14th of last year.
Q. Okay. Is that gross sexual imposition charge?
A. Yes, ma'am.
Q. It was felony of the fourth degree, I believe?
A. Yes, ma'am.
Q. Was it one victim?
A. Yes, ma'am.
Q. And you ended up making a deal with my office; right?
A. That's correct.
Q. Ended up pleading to a misdemeanor of the first degree?
A. Yes, ma'am.
Q. An assault charge?
A. Yes, ma'am.
Q. And that was in exchange for some things you were supposed to testify in this case; yes?
A. That's correct.
Q. The victim in that case was consulted; correct?
(Tr. at 1814-1815.)
 {¶ 61} As to Trent's plea agreement with the state, the following exchange occurred:
Q. [by Ms. Pritchard] Okay. State's Exhibit I-6, do you recall seeing that?
A. [by Mr. Trent] Yes, ma'am.
Q. And what is that?
A. It's a letter from the victim of my case saying she does have a problem with the agreement.
(Tr. at 1851.)
 {¶ 62} As support for his argument that defense counsel should have done more to prepare for Trent's testimony, appellant offers testimony given by the mother of the gross sexual imposition victim, Ms. Tonya Coons, in another capital case against appellant. In that case, Ms. Coons testified that she did not agree with the state's deal with Trent. However, as appellee notes, Ms. Coons admitted on cross-examination that she voluntarily signed a letter stating that she was in agreement with the deal. Appellant offers no evidence that Trent's credibility turned in any way on whether the victim's mother agreed with the deal, particularly when the record evidence included the victim's own objection to the deal. Testimony from the victim's mother would have been cumulative. Given defense counsel's attempts before and during trial to suppress Trent's testimony and related evidence, as well as their active engagement to limit its impact, evidence that Ms. Coons disagreed with Trent's plea deal lends no support for appellant's argument that defense counsel failed to prepare for or mitigate Trent's testimony. Therefore, we reject appellant's eighth and ninth grounds for relief.
 {¶ 63} Returning for the moment to appellant's fourth ground for relief, we conclude that this evidence concerning defense counsel's attempts to suppress and/or limit Trent's testimony also supports our rejection of appellant's assertion that defense counsel did not adequately prepare for Trent's testimony. Even if defense counsel had the transcript of Trent's May 26, 2002 interview, appellant has not presented evidence sufficient to require a hearing regarding defense counsel's effectiveness. Therefore, we reject appellant's fourth ground for relief.
 {¶ 64} Appellant's tenth ground for relief is that Ohio's post-conviction procedures are unconstitutional. However, as the trial court found, the doctrine of res judicata bars appellant's claims because appellant may bring such claims on direct appeal. In addition, Ohio courts have already addressed and rejected appellant's claim. See Hessler;Murphy. Therefore, we reject appellant's tenth ground for relief.
 {¶ 65} In his eleventh ground for relief, appellant asserts that the cumulative effect of the errors alleged in his post-conviction petition warrant an evidentiary hearing. Pursuant to the doctrine of cumulative error, a judgment may be reversed where the cumulative effect of errors deprives a defendant of his constitutional rights, even though the errors individually do not rise to the level of prejudicial error. State v.Garner (1995), 74 Ohio St.3d 49, 64, certiorari denied (1996),517 U.S. 1147. Because we have found no instances of error in this case, the doctrine of cumulative error is inapplicable. Therefore, we reject appellant's eleventh ground for relief.
 {¶ 66} Having rejected each of appellant's grounds for relief, we overrule appellant's assignment of error and affirm the judgment of the Franklin County Court of Common Pleas dismissing appellant's petition for post-conviction relief.
Judgment affirmed.
Brown, P.J., and Petree, J., concur.