OPINION
{¶ 1} Defendant-appellant John Drummond appeals the decision of the Mahoning County Common Pleas Court, which dismissed his petition for post-conviction relief without an evidentiary hearing. Appellant urges that the twenty-one grounds raised in his petition merit an evidentiary hearing. He also states that the court should have granted his motions for recusal, discovery and funds for a ballistics expert. For the following reasons, the judgment of the trial court is affirmed.
 STATEMENT OF THE CASE {¶ 2} On March 24, 2003, bullets showered through a house at 74 Rutledge Avenue on the East Side of Youngstown, Ohio. Inside, three-month-old Jiyen Dent, Jr. was killed by a bullet fragment to the head as he was sitting in his baby swing. Jiyen Dent, Sr. and Latoya Butler, the child's parents, had just moved into the house a few days before from the South Side of Youngstown. Mr. Dent stated that he associated with South Side gang members, and some helped him move in that day.
 {¶ 3} Appellant was indicted for two counts of aggravated murder: one under R.C. 2903.01(A), alleging purpose plus prior calculation and design, and one under R.C. 2903.01(C), alleging purpose plus a victim who is a child under thirteen years old. The counts carried the following two death specifications: purposely killing or attempting to kill two or more in a course of conduct under R.C. 2929.04(A)(5), and purposely causing the death of a child under thirteen and acting as the principal offender or with prior calculation and design under R.C.2929.04(A)(9). Appellant was indicted for two counts of attempted aggravated murder under R.C. 2923.02(A) and 2903.01(A) and two counts of felonious assault under R.C. 2903.11(A)(2) regarding the child's parents. He was also indicted for improperly discharging a firearm at or into a habitation. All counts contained firearm specifications.
 {¶ 4} The trial began on February 2, 2004. Testimony established that appellant was at a party on Duncan Lane, near Rutledge Avenue, on the night in question. Appellant was said to be a member of the Lincoln Knolls Crips and to have animosity toward South Siders. (Tr. 2896-98, 2949, 3080, 3135). At the party, appellant was heard talking about a person moving into the neighborhood who could be responsible for the death of a Lincoln Knolls Crips member, Brett Schroeder. (Tr. 2896-97, 2934, 3196-97). Testimony also established that appellant arrived at the party in Wayne Gilliam's car with an assault rifle. (Tr. 2663-64, 2900, 3071).
 {¶ 5} Testimony then established that appellant left the party with Wayne Gilliam in Gilliam's car, which drove toward Rutledge. (Tr. 2665, 2706, 2900). Gilliam's car was identified as driving back and forth near the targeted house. (Tr. 2615, 2660). Gunfire was heard minutes after appellant left the party. (Tr. 2667, 2900-01, 3267-68). A witness and her young child saw Gilliam fire a gun. (Tr. 3525, 3528, 3448). Gilliam's car was seen driving away immediately after the shots with the lights off; the car was also spotted pulling out of appellant's sister's driveway on Rutledge with its lights off. (Tr. 2570-77, 3265-70).
 {¶ 6} Police found ten 7.62 x 39mm shells from an assault rifle between 67 and 69 Rutledge. (Tr. 2739-40, 2809, 2914). They also found six 9mm shell casings on the corner of Rutledge and Duncan. (Tr. 2743). As to the 9mm shells, they concluded that five hit 76 Rutledge, the house next to the targeted house and one embedded intact in the kitchen wall in 74 Rutledge without entering the living room where the baby was located. (Tr. 2782-86, 2813-18, 2914-15). From the projectile direction and holes and fragments in walls, they concluded that it was a fragment of a 7.62 x 39mm that killed the baby. (Tr. 2438, 2449, 3402-06, 3573, 3581). Upon executing a search warrant where appellant resided, police discovered seventy-five live rounds of 7.62 x 39mm shredder ammunition and a gang book. (Tr. 3132-42).
 {¶ 7} A fellow inmate in jail testified that appellant admitted that he wanted to kill someone in the house but he did not intend to kill the baby. (Tr. 3187-90). Another inmate testified that he overheard this conversation. (Tr. 2997-98, 3005-06). The defense then called an inmate to testify that appellant was not housed near the testifying inmates and they would have had to yell to talk.
 {¶ 8} On February 11, 2004, the jury returned guilty verdicts on all seven counts and all specifications. After the mitigation phase, the jury recommended death. On February 20, 2004, the court imposed a death sentence on count one, which had been merged with count two. The court also imposed consecutive sentences of ten years on counts three and four, which were merged with counts five and six. Appellant also received another consecutive sentence of eight years on count seven. Finally, three years of actual incarceration was imposed on each firearm specification for the non-merged counts.
 {¶ 9} Appellant filed notice of appeal in the Ohio Supreme Court, resulting in Supreme Court Case Number 2004-Ohio-0586. The record was filed in that case on August 3, 2004. The Supreme Court released its decision affirming appellant's convictions and death sentence on October 18, 2006, the date this case was conferenced. State v. Drummond,111 Ohio St.3d 14, 2006-Ohio-5084.
 {¶ 10} In the meantime, on January 28, 2005, appellant filed a timely sixty-four page, twenty-one ground petition for post-conviction relief. See R.C. 2953.21(A)(2) (timely petition is filed no later than one hundred eighty days after the date on which the trial transcript is filed in the Supreme Court). Appellant also filed a motion for recusal of the trial judge and a motion for discovery. The state filed a motion for summary judgment. Appellant responded and also filed a motion for funds for a firearms/ballistics expert and another motion for discovery.
 {¶ 11} On September 29, 2005, the trial court granted the state's summary judgment motion. With regards to appellant's first fifteen grounds, the court found that the test for ineffective assistance of counsel was not met as there was no evidence that alternative trial tactics would have rendered a different outcome. Regarding his sixteenth ground, the court found that its rulings were discretionary and did not establish judicial bias. As for the seventeenth and eighteenth grounds, the court stated that juror testimony cannot impeach a verdict and that the death penalty scheme is constitutional. With regards to the nineteenth claim, the court noted that counsel stated on the record that appellant waived his presence for the discussion of the exhibits. Concerning the twentieth ground, the court stated that execution by lethal injection has been held to be constitutional. Lastly, the court found no cumulative error as there were not multiple instances of harmless error. Appellant filed timely notice of appeal to this court.
 GENERAL POST-CONVICTION RELIEF LAW {¶ 12} First, we shall review the pertinent statutory law on the subject of post-conviction relief. Pursuant to R.C. 2953.21(A), any person who has been convicted and who claims that there has been such a denial or infringement of his rights as to render the conviction void or voidable under the Ohio or the United States Constitution may file a petition stating the grounds for relief relied upon and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit or other documentary evidence in support of his claim. R.C. 2953.21 (A). Either party can move for summary judgment; although, it is typically the state that would file such motion. See R.C. 2953.21(D).
 {¶ 13} Before granting a hearing, the trial court must determine that there are substantive grounds for relief. R.C. 2953.21(C) and (E). In doing so, the court shall consider the petition, supporting affidavits, documentary evidence and all files and records in the case. R.C.2953.21(C). If the court dismisses the petition, it shall make and file findings of fact and conclusions of law with respect to the dismissal. R.C. 2953.21(C).
 {¶ 14} Thus, the petitioner is not automatically entitled to a hearing. State v. Calhoun (1999), 86 Ohio St.3d 279, 282. Rather, as aforementioned, the court must first determine that there are substantive grounds for relief. In other words, the court must find that there are grounds to believe that "there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States." Id. at 282-283, citing R.C. 2953.21(A) and (C). It is the petitioner who bears the initial burden to submit evidentiary documents and point to sufficient operative facts in support of his claim. Id. at 283, citing State v. Jackson (1980), 64 Ohio St.2d 107, 112.
 {¶ 15} When speaking of ineffective assistance of counsel in the post-conviction arena, well established tests apply. That is, the petitioner bears the initial burden to submit evidentiary documents and point to sufficient operative facts to demonstrate: (1) the lack of competent counsel, and (2) the defense was prejudiced by counsel's ineffectiveness. Id. Lack of competent counsel requires a showing of deficient performance resulting in errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by theSixth Amendment. Id. at 289, citing Strickland v. Washington (1984),466 U.S. 668, 687. Then, to show that the deficient performance prejudiced the defense, the defendant must show that counsel's errors were so serious that the outcome would have been different. Id. (defendant was deprived of a fair trial if the result is not reliable).
 {¶ 16} In presenting a case of ineffective assistance of counsel, the petitioner has quite a burden as counsel is strongly presumed to be competent. Id. There is a wide range of reasonable professional assistance, and the challenged action is typically presumed to be sound trial strategy. Strickland, 466 U.S. at 687-688. Decisions on presentation of witnesses are within the purview of trial tactics, and thus, judicial scrutiny of such decisions should be deferential.State v. Brown (1988), 38 Ohio St.3d 305, 319.
 {¶ 17} Post-conviction is further narrowed by the fact that resjudicata bars any claim that was or could have been raised at trial oron direct appeal. State v. Perry (1967), 10 Ohio St.2d 175, 180. Additionally, evidence outside the record does not guarantee the right to an evidentiary hearing. Id. The evidence must show that the petitioner could not have appealed his claim based upon the information in the original record. State v. Palmer (Oct. 20, 1999), 7th Dist. No. 96BA70 (mere presentation of evidence de hors the record does not transform a claim into one addressable in post-conviction). As will be demonstrated below, these concepts bar many of appellant's claims presented herein.
 {¶ 18} As for the effect of affidavits, the appellate court in theCalhoun case believed that in order to determine if there are substantive grounds for relief, the affidavits presented in support of a petition must be accepted as true. The appellate court further stated that conflicts in the supporting and rebutting evidence should not be resolved without a hearing. However, the Ohio Supreme Court disagreed and held that although the trial court should give due deference to the filed affidavits, it may use its sound discretion to judge their credibility. Calhoun, 86 Ohio St.3d at 284. The Supreme Court stated that to hold otherwise would require a hearing for every post-conviction relief petition, which is clearly not the intent of the statute. Id.
 {¶ 19} "Unlike the summary judgment procedure in civil cases, in postconviction relief proceedings, the trial court has presumably been presented with evidence sufficient to support the original entry of conviction, or with a recitation of facts attendant to an entry of a guilty or no-contest plea. The trial court may, under appropriate circumstances in postconviction relief proceedings, deem affidavit testimony to lack credibility without first observing or examining the affiant. That conclusion is supported by common sense, the interests of eliminating delay and unnecessary expense, and furthering the expeditious administration of justice." Id.
 {¶ 20} The Calhoun Court then adopted the following test out of the First District for considering the propriety of discrediting affidavits: (1) whether the judge reviewing the postconviction relief petition also presided at the trial, (2) whether multiple affidavits appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial, contradict evidence in the record by the same witness or are internally inconsistent. Id. at 284-285.
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 21} Appellant sets forth four assignments of error. The first assignment of error addresses each of the twenty grounds for relief set forth in his petition for postconviction relief; the twenty-first ground was cumulative error, which is presented in assignment of error number four. This assignment of error provides:
 {¶ 22} "THE TRIAL COURT ERRED BY DISMISSING APPELLANTS POSTCONVICTION PETITION, WHERE HE PRESENTED SUFFICIENT OPERATIVE FACTS AND SUPPORTING EXHIBITS TO MERIT AN EVIDENTIARY HEARING AND DISCOVERY."
 {¶ 23} Appellant generally contends that he met the pleading standard of submitting collateral evidence establishing sufficient operative facts to show various violations of his constitutional rights and that he was prejudiced from such violations. Thus, he claims that an evidentiary hearing was required.
 {¶ 24} As aforementioned, many of appellant's claims are barred by the doctrine of res judicata as they were or could have been raised in the direct appeal. Additionally, as is discussed under each relevant ground for relief, appellant's discovery or addition of some collateral fact to support certain arguments that could have been raised on direct appeal does not automatically transform the issue into one outside the record for purposes of post-conviction relief. Nevertheless, as this is a death penalty case, we shall thoroughly proceed through each issue individually rather than grouping them into one general category of failures.
 {¶ 25} Appellant starts by addressing the first three grounds for relief presented in his petition and argued that he sufficiently raised claims of ineffective assistance of counsel for failing to properly challenge the state's ballistics evidence. He notes that identification in this case was based upon the type of ammunition that killed the baby. He was said to have been carrying an AK-47 assault rifle, which only fires 7.62 x 39mm ammunition, and such ammunition was found at his residence during the execution of a search warrant. Ten casings from such ammunition were found in the street. From the direction of these casings and the holes in the walls, investigators could determine where many of the bullets ended up.
 {¶ 26} Appellant first complains that on cross-examination of BCI forensic scientist Chappell, counsel failed to forcefully utilize a sentence in that agent's report to clarify that the lead fragment removed from the baby's head was never ballistically identified as a certain caliber or as attributable to a certain weapon. He claims that this deficient cross-examination prejudiced the jury by letting them infer that the fragment was ballistically identified as 7.62 x 39mm. As evidence de hors the record, he pointed to the forensic scientist's report and affidavits from two jurors (both focusing on the ammunition found in appellant's residence, and one stating he had faith in the state's ballistics expert because there was nothing to rebut it).
 {¶ 27} As for the use of juror affidavits here and elsewhere in the petition, we point to our analysis under appellant's seventeenth and eighteenth grounds for relief. That is, these affidavits violate Evid.R. 606(B) and cannot be used to impeach the verdict.
 {¶ 28} As for the report, questioning on its conclusion would have been cumulative and unnecessary as evidenced by the following excerpts:
 {¶ 29} "Q. Now, I notice that you were able to say some things were 7.62, some were 9mms, but the other fragments you couldn't give a caliber to.
 {¶ 30} "A. That's correct.
 {¶ 31} "Q. Why is that?
 {¶ 32} "A. They were too small." (Tr. 2915).
 {¶ 33} And later, the state pointed to an exhibit with a lead fragment and two pieces of blue plastic, presumably from the baby swing:
 {¶ 34} "Q. Now did they tell you where those came from?
 {¶ 35} "A. They were recovered at autopsy.
 {¶ 36} "Q. From the victim?
 {¶ 37} "A. Yes.
 {¶ 38} "Q. Okay. Were you able to do anything with the lead fragments?
 {¶ 39} "A. No, I was not.
 {¶ 40} "Q. Is that because there's not enough detail there to compare it to anything?
 {¶ 41} "A. It was too small, and it also lacked details for comparison." (Tr. 2919).
 {¶ 42} Thus, there was plenty of undisputed evidence before the jury that the lead fragment could not be forensically identified as originating from a 7.62 x 39mm. As such, appellant's argument of ineffective assistance of counsel for failure to enlighten the jury on this matter is without merit.
 {¶ 43} Here, appellant embraces a report that essentially confirms an undisputed fact in the record. Accordingly, the report does not even constitute an issue. Moreover, even if there is an issue, a report not found in the record does not automatically equate to a valid issue for post-conviction review purposes where, as here, the issue could have been raised on direct appeal. Complaints that cross-examination should have emphasized certain points falls directly into that category. That is, the testimony itself establishes that the fragment was not scientifically determined to be a 7.62. Rather, it was admittedly concluded to be a fragment from such ammunition through circumstantial evidence of the location of the pile of cartridges, projectile directions, holes and fragment patterns. Thus, any desire for more emphasis by the defense on the inability to identify the caliber of the fragment removed from the baby's head is an issue for direct appeal.
 {¶ 44} In his second ground for relief, appellant complains that on cross-examination of this same agent, counsel failed to ask why he listed Churchill and Remington bolt-action rifles as possible source weapons in the report. More specifically, the report stated that one item analyzed was consistent with a 7.62mm caliber, copper-jacketed, fired bullet bearing four lands and grooves with a right direction of twist. Another item was analyzed to be consistent with a 7.62mm caliber, fired copper bullet jacket fragment. The report concluded that these two items were fired from the same weapon. Then, the report listed "possible" source weapons for these two items based upon the general rifling characteristics observed. A chart was provided with thirteen entries: there are columns for the manufacturer, the caliber and the type of firearm. The first eleven all had a caliber of 7.62 × 39mm and were considered automatic or semi-automatic rifles. The last two are those focused on by appellant here. Their manufacturers were Churchill and Remington respectively. Under their caliber was listed, "30-60 Springfield," and they were described as bolt-action rifles.
 {¶ 45} As evidence de hors the record, appellant points to these entries in the chart listing the bolt-action rifles as possible source weapons. He then provided photographs purporting to be assault rifles with someone trying to load 30-60 ammunition into them. He states that the pictures show that 30-60 caliber ammunition does not fit into an assault rifle like appellant was said to be carrying. And, he states that the bolt-action rifles cannot fire 7.62 × 39mm ammunition. Notably, there are no affidavits attesting to these pictures or statements.
 {¶ 46} Regardless, appellant exaggerates the effect of the last two entries in the report's chart. The chart begins by stating, "possible source weapons." And, it ends with another caveat that the list should not be considered complete. The report had already concluded that the two items (which are not even the ones alleged to have killed the baby) were 7.62 caliber. The fact that two possible source weapons were added to the end of the list that may not fire 7.62 caliber ammunition is not some boon in appellant's favor. Appellant was not alleged to have fired 30-60 caliber ammunition, and the items being classified were not concluded to be 30-60 caliber ammunition. The items at issue were forensically concluded to be a 7.62 caliber bullet and a 7.62 caliber bullet fragment taken from the targeted home; these types of bullets were found in appellant's home; these types of cartridges were found outside the targeted home; and appellant was said to carry a type of weapon that fires these types of bullets. In fact, the agent testified that a 7.62 is fired out of a rifle. The state then asked, "Any certain types of rifles? By that I mean I have a hunting rifle that's 30 Ott 6, 7mm," to which the agent responded, "The SKS and AK-47 type semiautomatic rifle." (Tr. 2914). Finally, the two items being discussed were not alleged to be related to the fragment taken from the baby. As such, there is a plethora of evidence establishing the irrelevance of the last two entries in the reports' chart.
 {¶ 47} Trial counsel may have known this and tactically decided that there was no point to question on this. An attorney need not pursue every conceivable avenue. State v. Murphy (2001), 91 Ohio St.3d 516,542. Possibilities and a perceived lack of effort to try to confuse the jury on an irrelevant matter do not establish grounds for an evidentiary hearing. There is no serious error in failing to question on this entry; nor are there sufficient facts pertaining to relevance and prejudice. Failure to question on a tangential subject does not equate with lack of investigation.
 {¶ 48} In his third ground for relief, appellant points to a report prepared by BCI agent Carlini based upon his contact with Youngstown Police Officer Marzullo. He concludes from the report that defense counsel was ineffective by failing to cross-examine the agent or the officer about a separate shooter theory. He urges that the report makes it just as likely that the lead fragment that killed the baby came from a 9mm slug as the state's theory that it came from a 7.62 × 39mm that fragmented.
 {¶ 49} However, testimony clearly established that two types of ammunition were fired at the house. (Tr. 2784). This was not some secret the state was trying to avoid and which defense counsel failed to acknowledge. As aforementioned, officers found six 9mm shell casings on the corner of Duncan and Rutledge. (Tr. 2812). A witness testified she saw gunfire coming from that corner. (Tr. 2571). The officers concluded that five of the six 9mm shots hit the neighboring house, 76 Rutledge. (Tr. 2783, 2814). And, the last 9mm bullet was found intact in the kitchen wall of the targeted house, 74 Rutledge. (Tr. 2785). It did not enter the living room where the baby was shot; nor were there any other holes entering from the side of house from which the 9mm was fired. (Tr. 2786, 2812).
 {¶ 50} Officers also found ten shells from 7.62 × 39mm ammunition between 67 and 69 Rutledge. The report cited herein specifically places the shooter of the 7.62 caliber ammunition in the proper projectile direction to have killed the baby considering the direction of shooting from the South and West and the placement of holes showing the point of fragmentation. On the other hand, the shooter of the 9mm was shooting from the East. The path of the hole on the East side of the house was followed and the bullet was recovered, unfragmented. The report is not some significant piece of collateral evidence as claimed by appellant. There is no indication of a lack of investigation from the mere failure to cross-examine on the portion of a report which concluded the same things being testified to on the stand, namely: that there were two shooters firing at the house from opposite directions, one with a 9mm and one with an assault rifle. This argument is without merit.
 {¶ 51} In his fourth ground for relief, appellant reiterates that the defense overlooked evidence that another individual may have been the shooter. He points to the 911 tape and claims that counsel should have hired an expert to enhance the quality. Appellant provides a transcription from an expert hired by post-conviction counsel. For purposes of this argument, appellant focuses on the following excerpts:
 {¶ 52} "911: Who's with him [the baby] right now?"
 {¶ 53} "Female Caller: My boyfriend. He's done nothin' like this and he was knockin' on the door."
 {¶ 54} [A male voice asks in the background], "Do you know if he [unclear word] in here before?"
 {¶ 55} Appellant claims that these comments on the tape raise a question as to whether someone else knocked on the door and whether that person was involved in the shooting. Appellant also points to the affidavit of his sister's boyfriend where he states that the child's mother has said that she does not know who shot her baby.
 {¶ 56} Appellant makes much out of one statement made by the hysterical mother after the police had already arrived at the scene. And, he fails to mention that prior to this statement, which is taken out of context, the father had been talking to the 911 operator about the baby's condition. Most importantly, the mother had just stated, "Somebody's knockin' at the door. My — The phone can't reach it. My boyfriend is in the other room." It is clear that her statement quoted by appellant about knocking on the door had to do with the fact that someone was actually knocking at the time she was talking to 911, but she could not get to the door and remain on the phone at the same time. It is also clear from reading the remainder of the transcription, that the police officer, who is the male voice in the background, was asking her where the baby was during the shooting. Finally, the affidavit appellant cites, which contains the mother's hearsay statement, adds nothing. The mother was in the house as bullets were penetrating. She never claimed to see appellant shoot the baby or at the house. Thus, her statement that she did not know who shot the baby does not contradict anything.
 {¶ 57} Under this ground for relief, appellant's petition also pointed to an affidavit of co-defendant Gilliam that indicates that Mr. Dent's cousin, a fellow inmate, told him that Mr. Dent was a member of the Crips gang. As appellant noted, Mr. Dent testified that he has friends who are gang members, he associates with gang members and gang members helped him move into his house the day of the shooting, but Mr. Dent denied being an actual gang member. (Tr. 2536, 2541). Appellant states that trial counsel failed to investigate Mr. Dent's gang affiliations, one of whom could have been knocking on the door that night.
 {¶ 58} As set forth above, the knocking mentioned in the 911 tape clearly referred to the emergency personnel. Moreover, the jury heard Mr. Dent testify that he has friends who are gang members and that some gang member friends helped him move into his house the day of the shooting. They also heard Mr. Dent deny being an actual gang member and deny that there was a reason for his house to have been fired on that night. (Tr. 2538). His credibility was in the jury's hands, not that he added to the identity of appellant anyway. Regardless of credibility, the jury heard that Mr. Dent is close with gang members. And, appellant does not detail what more the jury could have heard that would have made them think that someone else was the shooter with some gang-related motive other than that previously expressed by appellant himself at the party. The court could properly deny this ground for relief without a hearing.
 {¶ 59} In his fifth ground for relief, appellant contends that his trial attorneys rendered ineffective assistance of counsel when they failed to present a gang expert in mitigation. He points out that the state alleged that appellant fired at the house in retaliation for the killing of a fellow gang member. Thus, he believes that a gang expert was necessary. He notes that defense counsel questioned the defense's psychologist about gang influence, and thus, it was not some trial tactic to stay away from the gang topic.
 {¶ 60} Appellant then attached a report of a gang expert who stated that young people join gangs for a sense of belonging and acceptance and that gangs exert great influence on their members' decision-making. The expert stated that he reviewed this case and interviewed appellant. The expert concluded that despite the state's strong reliance on gang motivators, the defense did not produce a gang expert who could have provided the jury with important information. Appellant concludes that it was deficient performance to fail to secure a gang expert to testify and that his defense was prejudiced because the jury was not informed about the dynamics of gang culture.
 {¶ 61} Here, the defense utilized a mitigation investigator/social worker to collect background information for the clinical psychologist. Merely because the defendant is said to have had a gang-related motive does not mean that a proclaimed "gang expert" must be called in mitigation to try to evoke sympathy for the defendant by explaining that gangs generally influence decision-making. In hiring experts, "[attorneys need not pursue every conceivable avenue; they are entitled to be selective." State v. Foust, 105 Ohio St.3d 137, 2004-Ohio-7006, ¶ 107, quoting State v. Murphy (2001), 91 Ohio St.3d 516, 542.
 {¶ 62} Furthermore, the Ninth District has stated that failing to retain an expert to testify about gang culture in mitigation is a claimed deficiency that is on the record and thus could have been raised on direct appeal. State v. Stallings (Apr. 19, 2000), 9th Dist. No. 19620, discretionary appeal denied 90 Ohio St.3d 1404. They held that even if evidence outside of the record is presented to support the claim, the petitioner is barred if he fails to show that he could not appeal based upon the information in the record. Id., citing State v.Cole (1982), 2 Ohio St.2d 112, syllabus. See, also, State v. Combs
(1994), 100 Ohio App.3d 90 (1st Dist.). Here, although an affidavit of a gang expert is attached, the fact that the state's case revolved around gang motives and the fact that the psychologist used was not a "gang expert" was on the record and thus the failure to use a gang expert could have been raised on direct appeal.
 {¶ 63} Finally, it cannot be ignored (as appellant does) that the psychologist presented by the defense did provide the following insights relevant to this topic. Although he stated that he was not a "gang expert," he also revealed that he has practical experience with gang members and is often confronted with these issues in his practice. (Tr. 3820). The psychologist stated that appellant disclosed that he first entered the Crips gang culture at age thirteen or fourteen. (Tr. 3821-22). He pointed out that the choice to join at such a young age involved different decision-making processes than an adult would experience and that membership then exerted influence on appellant's later decision-making. (Tr. 3826).
 {¶ 64} As for the gang atmosphere, the psychologist testified to appellant's having witnessed much shooting, death and other violence such as hand-to-hand fights. (Tr. 3823, 3826). He then noted the importance of environment and the actors within it on how one psychologically develops. (Tr. 3823-24). He revealed that many of appellant's friends have died. (Tr. 3823). He pointed out that appellant was shot five times in 1994 at age sixteen, causing his leg to be amputated, and was shot again in 2001. (Tr. 3822). He noted that appellant adopted "survival tactics" to deal with his environment, such as arming himself. (Tr. 3824, 3826). He also described appellant's desensitization to violence and his nonchalant attitude toward having been shot multiple times. (Tr. 3828). Thus, although not an official "gang expert," the defense psychologist provided professional insights into appellant's gang membership.
 {¶ 65} Appellant next addresses his sixth through thirteenth grounds for relief together. He states that the defense attorneys failed to investigate, prepare and present mitigation evidence on his character, history and background that would have humanized him and provided reasons to spare his life. First, he points to counsel's November 7, 2003 motion for funds for a mitigation investigator and January 2, 2004 motion for appointment of a psychologist. With a February 2, 2004 trial, he concludes that counsel failed to immediately begin investigating as suggested in ABA guidelines for capital cases. This argument of timing in itself is on the record and thus could have been raised on direct appeal. In fact, appellant did make an unsupported argument on this issue to the Supreme Court. See Drummond at ¶ 211.
 {¶ 66} Appellant then states that the defense failed to rebut the prosecution's evidence that the mother of his children had to take him to court to establish paternity. He complains that the defense should have asked the children's mother to explain to the jurors that he only asked for paternity tests to satisfy his family. He cites to the affidavit of the children's mother. However, it does not rebut the statement that he originally believed he was not the father or that she went to court to establish paternity. Regardless, the state's evidence does not take away from appellant's current love for his children. The children's mother and appellant's mother both testified that appellant loves the twins. (Tr. 3754, 3779). Appellant's father testified that he is good with the twins, is patient and understanding, and often watched them while their mother worked. (Tr. 3769-70). The affidavit of the children's mother and appellant's argument herein does not give rise to sufficient operative facts that a serious error affecting the reliability of the outcome was committed regarding his love for his children.
 {¶ 67} Appellant then states that the jurors never learned that he had his leg amputated after being shot and did not hear the attendant psychological ramifications. We note here that the affidavits he points to disclose that he never filed charges against the shooter who claimed he thought appellant was someone else when he shot him. This evidence can be characterized as less than mitigating. In any event, the jury was informed more than once that appellant was shot five times at age sixteen and had his leg amputated as a result at age 17. His mother testified to such facts and explained that he had a long recuperation involving home care and visiting nurses. (Tr. 3750-51). His father also mentioned the shooting, amputation and rehabilitation. (Tr. 3766). The psychologist testified to these facts as well. (Tr. 3822, 3826, 3843).
 {¶ 68} Appellant next complains that the jury was unaware that he grew up in a dysfunctional family. In his petition, he cited his half-brother's affidavit, which states there was lack of supervision growing up and that he was a poor role model. He cited his maternal aunt's affidavit, which claims that appellant's father sexually molested her when she was younger. He also pointed to civil protection orders his father filed against his mother when he was a teenager. In his petition, appellant cited to an affidavit of a mitigation specialist on staff at the Ohio Public Defender's Office. She concluded that the defense failed to allow an adequate amount of time to conduct the mitigation investigation. She also opined that the mitigation expert failed to interview certain family members, such as the ones whose affidavits are mentioned supra.
 {¶ 69} The Supreme Court has stated that a mitigation investigator is not a requirement for effective assistance of counsel. State v.McGuire (1997), 80 Ohio St.3d 300, 399. Here, a mitigation investigator was in fact retained as was a psychologist. The Supreme Court also stated that the defense is not ineffective for failing to call all available family members. Id. The jury here was aware of a lack of supervision over appellant as a teen. They heard that appellant's parents divorced when he was 14 or so and that he stayed with his father at first until they had a falling out at which time he moved in with his brother. They heard that he had failing grades and dropped out of school around such time. And, as set forth supra, they heard that he joined a gang. Without evidence that appellant was aware of the alleged molestation of appellant's aunt by his father or violence by his mother, there is no indication of relevance. Moreover, if anyone could have provided accurate information on appellant's family life to the defense and the psychologist, it was appellant himself.
 {¶ 70} Appellant also cited to the affidavit of Dr. Fabian, the psychologist hired by the defense. He claims that he did not have sufficient time to prepare and opines that the defense's mitigation theory lacked clarity and organization in that he was not asked about appellant's borderline cognitive functioning and low IQ.
 {¶ 71} At the mitigation hearing, the psychologist reviewed the various records and information received by the mitigation investigator. (Tr. 3810, 3843). The psychologist testified that he met with appellant at least four times. (Tr. 3810). As for the IQ information, he presented plenty of testimony on this topic. He testified that appellant's IQ was 82, that average is 100, that 70 is mildly retarded and that most people fall between 90 and 110. He concluded that appellant's IQ was significantly below average and that appellant's verbal performance was worse than his nonverbal performance. (Tr. 3812). Nothing new and outstanding has been added at this time. Thus, this argument is overruled. For the foregoing reasons, the arguments set forth in appellant's brief under his sixth through thirteenth grounds for relief are without merit and do not warrant an evidentiary hearing.
 {¶ 72} Next, appellant's brief addresses his fourteenth and fifteenth grounds for relief together. He claims that counsel's failure to investigate left the defense unprepared to rebut the state's case. Relevant to his fourteenth ground for relief, he complains that counsel did not attempt to interview co-defendant Wayne Gilliam. He claims that counsel would have learned that appellant was drunk on the night of the shooting and that Gilliam heard gunfire after appellant returned to the car thus raising the inference of a second shooter.
 {¶ 73} However, counsel could have learned from appellant himself that he was drunk that night. In fact, appellant's own affidavit states that he was drinking a lot of brandy. An interview of the co-defendant was not necessary to obtain this fact. We also note that contrary to appellant's suggestion, voluntary intoxication is no longer relevant to the element of criminal intent. R.C. 2901.21(C) (effective Oct. 27, 2000).
 {¶ 74} As for the separate burst of gunfire, other testimony established that there were two bursts of gunfire coming from different directions, the second set coming from the corner of Duncan and Rutledge where the 9mm casings were found. (Tr. 2570-71). Additionally, other testimony established that a 9mm was also fired at and around the residence. (Tr. 2812-14, 2783-85). As mentioned earlier, this second shooter theory was not ignored; in fact, it was displayed by the state in its own investigative testimony. Finally, as Gilliam's affidavit states, he gave a statement to police implicating appellant in the shooting. Thus, exculpatory information from an interview of Gilliam was unlikely. In fact, appellant's defense was that Gilliam and another were the shooters, even though police searching for casings immediately after the shooting spotted appellant and Gilliam together near the crime scene. (Tr. 2719-2723). The facts appellant urges us to consider in Gilliam's affidavit do not establish serious error that prejudiced the defense, which leads into the next alleged ground for relief.
 {¶ 75} Relevant to his fifteenth ground for relief, appellant complains that the defense failed to competently cross-examine two witnesses, Wanda and William Greer. Mrs. Greer, a neighbor, testified that she saw Gilliam's car driving back and forth and later heard gunshots. She also mentioned gang activity in the neighborhood. Mr. Greer testified that he saw appellant arrive at the party on Duncan Lane as a passenger in Gilliam's car, that he saw appellant carrying a large gun and that he saw Gilliam leave the party with appellant as the passenger driving toward Rutledge minutes before the shots were fired. (Tr. 2655-2667).
 {¶ 76} Appellant states that defense counsel should have impeached the Greers' testimony with evidence that they used and sold crack cocaine. He again cites to Gilliam's affidavit. First, we note that Gilliam's affidavit does not mention that the Greers sold crack. It alleges that they bought crack from two people who have previously sold drugs from their driveway. We cannot presume that the rational trial tactic of refusing to accuse two state's witnesses of using crack based upon a claim of a co-defendant gang member was not a strategic choice. Although counsel could have inquired of any witnesses if they clearly observed the events and if they were under the influence of any substance that night, the failure to do so does not constitute serious error resulting in an unreliable trial.
 {¶ 77} In any event, a contention of past drug buys is not proper impeaching evidence of a witness as it does not relate to character for truthfulness or untruthfulness. See Evid.R. 404(A) and (B); 405(A); 608(A)(1). Also, Gilliam's claims do not constitute a reasonable basis for asking a question regarding past crack cocaine purchases. See Evid.R. 607(A) and (B). Furthermore, the trial court could properly determine that Gilliam's affidavit lacked credibility. As a matter of fact, Mrs. Greer's testimony explained the past presence of gang members hanging out in front of her house by complaining that they were rampant, noting that they carved a tombstone in the city tree across the street from her house in memory of a slain gang member. Finally, Gilliam's affidavit claimed that he would have testified; however, as aforementioned, he had already given a statement implicating appellant in the shooting. It was thus rational for the defense to avoid Gilliam's testimony.
 {¶ 78} Appellant then states that the defense should have impeached Mrs. Greer's testimony with a conviction of a crime of dishonesty, for which she was convicted less than ten years before, citing Evid.R. 609 (A)(3) and (B). He attached to his petition evidence of her conviction for the first degree misdemeanor of passing a bad check in an amount under $300. We note that the offense occurred almost ten years prior to the date of appellant's trial. Although impeachment was permissible with such offense, prejudice is lacking. Ms. Greer's testimony did not actually implicate appellant; rather, it merely mentioned seeing a car like Gilliam's drive back and forth in corroboration of much other testimony. Thus, her testimony was tangential and cumulative.
 {¶ 79} In his sixteenth ground for relief, appellant claims that he has evidence outside of the record of the trial judge's bias. He cites to Gilliam's sentencing transcript where the same judge presided. He takes issue with the following statements made to Gilliam by the sentencing judge: "[I]t's hard for me to use judicial restraint, as some of you will know. But I must in this situation because of the pending codefendant's case;" "[Y]ou lost your soul that night;" and "[You are] One Little 140 pound follower weasel."
 {¶ 80} Appellant concludes that due to the trial judge's role in Gilliam's trial, appellant's trial was tainted. In support of his claims of bias, he also cites to various rulings made against him such as that the jury was permitted to see photographs of the deceased baby. However, the rulings made against him were discretionary decisions subject to direct appeal. Further, the statements made in Gilliam's sentencing do not show some kind of future, potential prejudice against appellant. Additionally, the Gilliam sentencing transcript was available months before appellant's trial if an Affidavit of Disqualification in the Supreme Court was warranted. See R.C. 2701.03.
 {¶ 81} Finally, we point to our analysis under appellant's second assignment of error, where he contends that the court should have granted his motion for recusal prior to ruling on his post-conviction petition. There we explained that a court is not precluded from presiding over a co-defendant's trial merely because the court presided over and expressed opinions at the other defendant's trial. State v.D'Ambrosia (1993), 67 Ohio St.3d 185, 188. We also stated that the appellate court is without authority to pass upon issues of disqualification or to void a judgment on the basis that a judge should be disqualified for bias or prejudice. See, e.g., Beer v. Griffith
(1978), 54 Ohio St.2d 440, 441-442; Gains v. Harman,148 Ohio App.3d 357, 2002-Ohio-2793, ¶ 42-43. An appellate court can review criminal jury trials to determine whether a judge's behavior prejudiced or biased the jurors. State v. Wade (1978), 53 Ohio St.2d 182, 188. However, that is the topic for the direct appeal, not post-conviction relief.
 {¶ 82} In his seventeenth and eighteenth grounds for relief, appellant claimed to have exposed a deficient death penalty scheme due to the fact that the jurors failed to understand and follow the instructions on weighing aggravating and mitigating circumstances. Appellant contends that the jury improperly used non-statutory aggravating circumstances to impose a death sentence.
 {¶ 83} As evidence de hors the record, he used the affidavits of two jurors. One juror stated that the aggravating circumstances that led him to vote for death were appellant's "lack of remorse and that he did not own up to his life responsibilities before his arrest." The other juror stated that the aggravating circumstance for him was that appellant "would be so aggressive as to shoot into a home with an assault rifle so indiscriminately as to not care who was injured."
 {¶ 84} Appellant was found to have committed two aggravating circumstances beyond a reasonable doubt; that is, the jury found for the state on the two death specifications: purposely killing or attempting to kill two or more in a course of conduct under R.C. 2929.04(A)(5), and purposely causing the death of a child under thirteen and acting as the principal offender or with prior calculation and design under R.C.2929.04(A)(9).
 {¶ 85} R.C. 2929.04(B) provides that if one or more of the aggravating circumstances listed in R.C. 2929.04(A) and specified in the indictment were proven beyond a reasonable doubt, then the jury shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors: (1) whether the victim induced or facilitated it; (2) whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion or strong provocation; (3) whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law; (4) the youth of the offender; (5) the offender's lack of a significant history of prior criminal convictions and delinquency adjudications; (6) if the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim; and (7) any other factors that are relevant to the issue of whether the offender should be sentenced to death.
 {¶ 86} Appellant concludes that the juror's labeling of lack of remorse and indiscriminate shooting as aggravating circumstances resulted in an unconstitutional application of Ohio's death penalty scheme. However, appellant was found to have committed the two indicted aggravating circumstances beyond a reasonable doubt; that is, he purposely killed or attempted to kill two or more in a course of conduct, and he purposely caused the death of a child under thirteen and acted as the principal offender or with prior calculation and design. Just because in an affidavit written one year after trial, the jurors labeled certain reasons for their vote as "aggravating circumstances" since they did not find them to be mitigating does not call their verdict into question. In any event, the statute states the jury shall consider and weigh various listed factors and specifically includes a catch-all provision of any other relevant factor. R.C. 2929.04(B). Consequently, the factors mentioned by the jurors were permissible considerations.
 {¶ 87} Furthermore, juror affidavits cannot be used to impeach the verdict in this case. Evid.R. 606 (B), entitled, "Inquiry into validity of verdict or indictment," provides:
 {¶ 88} "Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented. However a juror may testify without the presentation of any outside evidence concerning any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court. His affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying will not be received for these purposes."
 {¶ 89} The purpose of this aliunde rule is to maintain the sanctity of the jury room and the juror's deliberations, to ensure the finality of jury verdicts and to protect jurors from being harassed by defeated parties. State v. Hessler (2000), 90 Ohio St.3d 108, 123. There is no allegation that the exceptions to the rule apply here. As such, the affidavits are improper.
 {¶ 90} We also note that appellant's only appellate argument regarding our application of Evid. 606 to bar the affidavits is that by a 2004 administrative order, the Ohio Supreme Court allowed ABC News into a Cuyahoga County jury room to televise deliberations during the trial and mitigation phases in the case of State v. Ducic. Appellant concludes that the Supreme Court must thus no longer believe jury deliberations are subject to sanctity. However, this court cannot jump to such a conclusion and cannot override Evid.R. 606(B) based upon some Supreme Court administrative order to allow media into deliberations. The rule is still applicable to protect the finality of verdicts.
 {¶ 91} In his nineteenth ground for relief, appellant contends that he did not waive his right to be present during discussion of the exhibits. At 4:20 p.m. on the day before the exhibits were introduced, the court instructed the parties to spend time that night going through the exhibits and determine any objections. The court advised the parties to be present at 8:45 a.m. the following morning to discuss the exhibits. (Tr. 3534). Appellant was present when this instruction was given. The next morning, court opened at 9:02 a.m. (Tr. 3535). After discussion of many of the exhibits and the objection thereto, the court stated, "The record should reflect that John Drummond waived his right to be present during discussion of the exhibits." (Tr. 3545).
 {¶ 92} As evidence de hors the record, appellant presents his own affidavit stating that his attorneys never discussed that they were waiving his presence for discussion of the exhibits. He claims, "I didn't waive my presence at anything. I wanted to be present at all hearings and trial proceedings." Appellant concludes that his due process right to be present at all critical stages was denied as the objections to state's exhibits is a critical stage.
 {¶ 93} Section 10, Article I of the Ohio Constitution provides that "[i]n any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel." A criminal defendant has a federal and state fundamental due process right to be present at all critical stages of his trial, absent a waiver of rights or other extraordinary circumstances. State v. Williams (1998), 82 Ohio St.3d 16,26 (referring to "critical stages"); State v. Hill (1995),73 Ohio St.3d 433, 444 (referring to "critical stages"); State v. Williams (1983),6 Ohio St.3d 281, 286 (referring to "every stage"). And, Crim.R. 43(A) provides:
 {¶ 94} "The defendant shall be present at the arraignment and every stage of the trial, including the impaneling of the jury, the return of the verdict, and the imposition of sentence, except as otherwise provided by these rules. In all prosecutions, the defendant's voluntary absence after the trial has been commenced in his presence shall not prevent continuing the trial to and including the verdict."
 {¶ 95} In Williams, a manager of a gas station where a jury view took place spoke to the jurors. The defendant moved for a mistrial, and the court conducted an in camera voir dire of the affected jurors without the defendant's presence. The Supreme Court of Ohio found that the trial court committed error, but found that prejudice was lacking and that the defendant's absence was harmless beyond a reasonable doubt.Williams, 6 Ohio St.3d at 286, 287. First, the court found that the defendant's interests were more than adequately protected by his attorney who was present. Id. at 286. Second, the court found that his presence would have contributed little. Id. at 287. Third, the court found that his failure to timely object constituted waiver of the argument. Id.
 {¶ 96} In White, the defendant was not present for a hearing on proposed jury instructions. His counsel stated that he would get a signed waiver for the record, but he never did so. The Ohio Supreme Court held that prejudicial error exists only where "a fair and just hearing [is] thwarted by [the defendant's] absence." White,82 Ohio St.3d at 26, quoting Snyder v. Massachusetts (1934), 291 U.S. 97, 108. The Court concluded that the defendant's absence was harmless beyond a reasonable doubt. Id.
 {¶ 97} As the state points out, waiver of presence does not require the defendant to be present to make the waiver, or he would obviously not be absent. Nor does any rule require some kind of affidavit to be presented to the court before proceeding. Furthermore, the court reviewing the petitioner's affidavit can determine without an evidentiary hearing that it lacked credibility in claiming that he did not advise his attorneys that he waived his presence. See State v.Calhoun (1999), 86 Ohio St.3d 279, 284.
 {¶ 98} Appellant's attorneys acknowledged that he waived his presence at the discussion of the exhibits. Considering the fact that objections had already been entered to the exhibits as they were being identified in the record, discussion of exhibits after the close of the evidence was not such a critical stage. It is certainly not more critical than presence at a voir dire of jurors who were improperly approached and instructed by the manager of a gas station on a jury view. As inWilliams, appellant's interests were adequately protected by his two attorneys, and appellant could have added nothing to the proceeding. Moreover, he knew that the exhibits would be discussed at 8:45 a.m., and yet, he later stated nothing about his presence or desire to be there. Appellant has failed to establish a serious error or prejudice.
 {¶ 99} In his twentieth ground for relief, appellant claims that death by lethal injection constitutes cruel and unusual punishment and a violation of due process under the state and federal constitutions. Appellant contends that one of the three drugs used in a lethal injection, pancuronium bromide, will likely place him in a state of "chemical entombment" while he consciously experiences suffocation and the pain of cardiac arrest. In support, he attached the affidavit of an anesthesiologist, who states that he has researched the various techniques used during lethal injection. He notes that use of pancuronium is now prohibited for euthanasia by many veterinary guidelines. This doctor opined that if thiopental, one of the other three drugs, is not administered in a dose sufficient to induce the loss of consciousness, then the use of pancuronium places the inmate at risk for consciously experiencing paralysis, suffocation and the excruciating pain of the intravenous injection of high dose potassium chloride, the remaining of the three drugs. Based on some letter he reviewed, which provides the dosages of the three drugs, the anesthesiologist concluded that Ohio's lethal injection protocol creates an unacceptable risk that the inmate will not be anesthetized to the point of being unconscious and unaware of the pain.
 {¶ 100} The letter the doctor relied on is printed on Ohio Department of Correction letterhead and supposedly signed by a staff attorney for some warden. We note that it has no addressee listed after "Dear," and it is dated May 30, 2002. The doctor's affidavit in this case was signed on December 30, 2003. Appellant's petition for post-conviction relief was filed in January 2005. There is no indication that the information on dosages in the letter is still accurate, over two and a half years later.
 {¶ 101} Furthermore, the Ohio Supreme Court has upheld the constitutionality of death by lethal injection. State v. Adams,103 Ohio St.3d 508, 2004-Ohio-5845, ¶ 131; State v. Carter (2000),89 Ohio St.3d 593, 608. In fact, the Supreme Court in the direct appeal of appellant's conviction overruled his argument that Ohio's death penalty scheme is unconstitutional. Drummond at ¶ 241, citing Carter. For all of the foregoing, this assignment of error is overruled as the trial court could properly deny appellant's petition without an evidentiary hearing.
 ASSIGNMENT OF ERROR NUMBER TWO {¶ 102} Appellant's second assignment of error alleges:
 {¶ 103} "THE TRIAL COURT ERRED BY FAILING TO RULE ON APPELLANT'S MOTION FOR VOLUNTARY RECUSAL OF THE TRIAL JUDGE AND THEN DISMISSING THE POSTCONVICTION PETITION WITHOUT A HEARING, THUS TAINTING THE POSTCONVICTION PROCESS."
 {¶ 104} Appellant urges that the trial judge should have recused herself from ruling on his post-conviction relief petition. He cites to her rulings against him. He also cites to the sentencing transcript in Gilliam's case. He points out that the judge had security at the courthouse and at her residence during this trial. He then focuses on the fact that he asked to take her deposition in his motion for discovery. He concludes that her impartiality is in question because she is likely to be a material witness regarding his post-conviction grounds (discussed above) dealing with judicial bias and the ineffective assistance of counsel in failing to hire a gang expert. He also takes issue with the fact that the court's grant of summary judgment against him closely mirrors the state's summary judgment motion and thus fails to satisfy the requirement that the court issue findings of fact and conclusions of law.
 {¶ 105} Initially, we point out that R.C. 2701.03 provides the proper procedure for seeking disqualification of a common pleas court judge. See, also, Section 5(C) of Article IV of the Ohio Constitution. An appellate court is without authority to pass upon issues of disqualification or to void a judgment on the basis that a judge should be disqualified for bias or prejudice. See, e.g., Beer v. Griffith
(1978), 54 Ohio St.2d 440, 441-442; Gains v. Harman,148 Ohio App.3d 357, 2002-Ohio-2793, ¶ 42-43; Wolk v. Wolk (Sept. 25, 2001), 7th Dist. No. 98CA127; State v. Cope (July 17, 2001), 7th Dist. No. 2000CO38 (noting that the Chief Justice of the Supreme Court or his designee has exclusive jurisdiction to determine a claim that a common pleas court judge is prejudiced); Grogan v. T.W. Grogan Co. (2001),143 Ohio App.3d 548 (where the Eighth District stated that trial courts' refusal to recuse themselves is not appealable to the appellate court); State v.Ramos (1993), 88 Ohio App.3d 394, 398.
 {¶ 106} Here, appellant asked for the voluntary recusal of the trial court judge. Where the trial court refuses to recuse itself, however, appellant must follow the disqualification procedure in the Supreme Court. He cannot forgo this procedure and appeal the issue to the court of appeals in order to avoid Supreme Court jurisdiction over the issue. We note that he even entitled his motion as one for "voluntary recusal," implying that counsel was aware that the motion is not a substitute for an Affidavit of Disqualification.
 {¶ 107} Furthermore, we also point out that after stating that a defendant should have sought disqualification as soon as possible, the Ohio Supreme Court made a point of particular relevance to the instant appeal:
 {¶ 108} "However, we find that defendant's allegation of bias also fails on its merits. A judge need not recuse himself simply because he acquired knowledge of the facts during a prior proceeding. See Annotation, Disqualification from Criminal Proceeding of Trial Judge Who Earlier Presided over Disposition of Case of Coparticipant (1989), 72 A.L.R. 4th 651, 658, 661-663. Even if [judge] formed an opinion of [codefendant's] veracity based on his earlier testimony at [another codefendant's] trial, such an opinion did not disqualify the judge from this case. `[W]hat a judge learns in his judicial capacity — whether by way of guilty pleas of codefendants or alleged coconspirators, or by way of pretrial proceedings, or both — is a proper basis for judicial observations, and the use of such information is not the kind of matter that results in disqualification.' United States v. Bernstein (C.A.2, 1976), 533 F.2d 775, 785. Since `evidence presented in the trial of a prior cause * * * do[es] not stem from an extrajudicial source,' it creates no personal bias requiring recusal. State v. Smith (Iowa 1976),242 N.W.2d 320, 324." State v. D'Ambrosia (1993), 67 Ohio St.3d 185,188.
 {¶ 109} Thus, appellant's argument regarding the trial judge having presided over the trial of Gilliam is without merit as well as procedurally flawed. Similarly, his argument that the judge's impartiality is called into question because she was likely to be a material witness fails. Just because appellant wishes to depose the trial judge does not mean that she is likely to be a material witness. There is no reason to depose the judge to determine if the effect of gang culture was an issue at the trial or to state that the defense failed to secure a gang expert. As for her alleged bias, the record is available, and appellant failed to file an Affidavit of Disqualification with the Supreme Court. Furthermore, having security at one's house and extra security at the courthouse does not make a judge biased or require her deposition and recusal.
 {¶ 110} Finally, use of the state's language in a judgment entry is not evidence of bias or a violation of the provision in R.C. 2953.21(C), which requires findings of fact and conclusions of law to be filed when a court dismisses a petition without hearing. "A trial court's adoption of the findings of fact and conclusions of law submitted by the state does not, by itself, deprive a petitioner of a meaningful review of a petition for postconviction relief and does not constitute error in the absence of demonstrated prejudice." State v. Kinley (1999),136 Ohio App.3d 1, 21 (2d Dist.), citing State v. Powell (1993),90 Ohio App.3d 260, 263, State v. White (Aug. 7, 1998), 5th Dist. No. 97COA1229, andState v. DeBlanco (July 14, 1998), 10th Dist. No. 97APA08-1049.
 {¶ 111} Here, the court used the state's language setting forth the facts of the case. Some of the legal conclusions were the same or similar, but the court changed other legal conclusions. Either way, bias is not apparent. The reasons for requiring findings are to apprise the petitioner of the grounds for the trial court's decision and to enable the appellate court to review that decision. State v. Calhoun (1999),86 Ohio St.3d 279, 291. Here, we have sufficient findings and conclusions to review the decision. For all of the foregoing reasons, this assignment of error is without merit.
 ASSIGNMENT OF ERROR NUMBER THREE {¶ 112} Appellant's third assignment of error contends:
 {¶ 113} "OHIO'S POSTCONVICTION PROCEDURES NEITHER AFFORD AN ADEQUATE CORRECTIVE PROCESS NOR COMPLY WITH DUE PROCESS AND EQUAL PROTECTON UNDER THE FOURTEENTH AMENDMENT."
 {¶ 114} Here, appellant complains that post-conviction is not an effective remedy when an indigent has the burden of supporting his petition with evidence outside the record but is not afforded discovery and funds for an expert. He urges that the procedure violates due process where he has no opportunity to subpoena witnesses, take depositions, issue interrogatories or hire experts. Since post-conviction is considered a civil action, he ponders why he lacks access to traditional discovery.
 {¶ 115} In a case cited by appellant, the Eighth District held that the trial court does not abuse its discretion in denying discovery before an evidentiary hearing is found to be warranted. State v.Sherrills (Jan. 16, 1992), 8th Dist. No. 61882. The court continued that if the petition is found to be properly dismissed without hearing, then the issue of discovery is moot. Id. The court relied on the post-conviction statute, which places the burden of production upon the petitioner to demonstrate substantive grounds for relief. Id. "Until that burden is met, it is not an abuse of discretion to deny discovery." Id. (noting that regulation of discovery is within the trial court's discretion).
 {¶ 116} The Second District cites to Civ.R. 1 to support its holding that discovery is not required. State v. Kinley (1999),136 Ohio App.3d 1, 20-21. Civ.R. 1(C)(7) provides:
 {¶ 117} "These rules to the extent that they would by their nature be clearly inapplicable, shall not apply to procedure * * * in all other special statutory proceedings; provided, that where any statute provides for procedure by a general or specific reference to the statutes governing procedure in civil actions such procedure shall be in accordance with these rules."
 {¶ 118} The Kinley court concluded that since post-conviction proceedings are special statutory proceedings and R.C. 2953.21 makes no provision for the application of the civil rules, a petitioner is not entitled to discovery in post-conviction proceedings. Id. at 21, citingState v. Chinn (Aug. 21, 1998), 2d Dist. No. 16764; State v. Spirko
(1998), 127 Ohio App.3d 421, 429 (3d Dist.); State v. Smith (1986),30 Ohio App.3d 138, 140 (where the Ninth District held that in determining whether there are substantive grounds for relief so that a hearing must be granted, the trial court is not required to order that interrogatories propounded by the petitioner be answered). Finally, the Tenth District has stated that the civil rules generally apply, but since post-conviction is a statutory creation, it is controlled by that statute's procedural requirements when those requirements conflict with the civil rules. State v. Conway, 10 Dist. No. 05AP-76, 2005-Ohio-6377, ¶ 11 (holding that there is no requirement of civil discovery in post-conviction proceedings).
 {¶ 119} In conclusion, state collateral review itself is not a constitutional right. State v. Calhoun (1999), 86 Ohio St.3d 279, 281. As appellant acknowledges, it is a civil attack on a judgment. See id. As such, the petitioner has only those rights granted by the statute. Id.; State v. Steffen (1994), 70 Ohio St.3d 399, 410. The post-conviction statute does not provide a right to discovery. SeeState ex rel. Love v. Cuyahoga Cty. Pros. Office (1999),87 Ohio St.3d 158, 159 (refusing to issue a writ to compel prosecutor to provide records for petitioner to prepare post-conviction petition). Rather, it places the burden on the petitioner to produce collateral evidence in order to warrant an evidentiary hearing. Calhoun, 86 Ohio St.2d at 281.
 {¶ 120} Thus, discovery is not required before determining whether an evidentiary hearing is warranted by a petition. State v. Herring, 7th Dist. No. 03MA12, 2004-Ohio-5357, ¶ 152 (no statutory right to discovery). No constitutional rights are violated by this rule. SeeState v. Leonard, 157 Ohio App.3d 653, 660, 2004-Ohio-3323, ¶ 10 (where the First District held that the failure of the statutes to provide discovery in the initial stages of a post-conviction proceeding does not contravene any state or federal constitutional right); State v.Goff (Mar. 5, 2001), 12th Dist. No. CA2-5-05-041 (where the appellant raised the same assignment of error and cited the same federal circuit court case law that commented on the lack of traditional discovery in Ohio's post-conviction process). See, also, Calhoun,86 Ohio St.2d at 281 (no constitutional right to post-conviction review).
 {¶ 121} Likewise, there is no right to funds to hire an expert to criticize the state's ballistics conclusions before an evidentiary hearing has been determined to be warranted. See State v. Carter,157 Ohio App.3d 689, 694, 2004-Ohio-3372, ¶ 17 (1st Dist.);Leonard, 157 Ohio App.3d 653 at ¶ 10 (stating that petitioner was entitled to discovery to develop his claims and the experts to aid in that discovery only if the petition and its supporting evidentiary material demonstrated substantive grounds for relief), citing State v.Issa (Dec. 21, 2001), 1st Dist. No. C-000793.[1]
 {¶ 122} True, R.C. 2953.21(I)(1) provides a right to appointed counsel for indigent petitioner sentenced to death. But, it provides no rights to funding for investigations to attempt to support the petition in order to demonstrate a right to an evidentiary hearing. This issue of funding experts is encompassed in the discovery issue set forth above. That is, there is no constitutional problem in placing on the petitioner the initial burden of production to produce evidence warranting a hearing without using the discovery process and the resources of the state for experts to aid that process. See Herring, 7th Dist. No. 03MA12 at ¶ 152 (stating no right to discovery in post-conviction death case). Finally, we cite to our rulings under his first assignment of error, specifically regarding his first and second grounds for relief, where we held that his claims regarding the insufficient rebuttal of the state's ballistics evidence were unfounded.
 {¶ 123} Accordingly, the court did not err in failing to rule on his discovery motion and motion for funds for an expert prior to ruling on the post-conviction petition. This assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER FOUR {¶ 124} Appellant's fourth and final assignment of error claims:
 {¶ 125} "CONSIDERED TOGETHER, THE CUMULATIVE ERRORS SET FORTH IN APPELLANTS SUBSTANTIVE GROUNDS FOR RELIEF MERIT REVERSAL OR REMAND FOR A PROPER POSTCONVICTION PROCESS."
 {¶ 126} Appellant asks us to review our conclusions in the prior assignments of error to determine if any errors that we found were not prejudicial individually become prejudicial when combined with other harmless errors. First, the court must find that multiple errors were committed at trial. State v. Madrigal (2000), 87 Ohio St.3d 378, 398. Then, the court must determine if these separately harmless errors violated the defendant's right to a fair trial when the errors are considered together. Id. at 397.
 {¶ 127} This argument was his twenty-first ground for relief in his post-conviction relief petition. After considering the results of our analysis on his first twenty grounds for relief in his first assignment of error and his second and third assignments of error, there is no prejudicial or cumulative error. Therefore, the trial court's dismissal of appellant's post-conviction relief petition is upheld.
 {¶ 128} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
Donofrio, P.J., concurs.
Reader, J., concurs.
[1] We note that the scenario here is distinguishable from cases where the petitioner desires funds for an expert to show he is mentally retarded since those cases are based upon the constitutional right not to be executed if mentally retarded. See Atkins v. Virginia (2002),536 U.S. 304; State v. Lott, 97 Ohio St.3d 303, 2002-Ohio-6625.