[Cite as *State v. Rupp*, 2010-Ohio-2532.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | CASE NO. 09-MA-149 |
| | ) | |
| FORREST RUPP, | ) | OPINION |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:     Criminal Appeal from Court of Common Pleas of Mahoning County, Ohio Case No. 04CR767

JUDGMENT:     Affirmed

APPEARANCES:
For Plaintiff-Appellee     Paul Gains
Prosecutor
Ralph M. Rivera
Assistant Prosecutor
21 W. Boardman St., 6th Fl.
Youngstown, Ohio 44503-1426

For Defendant-Appellant     Melissa M. Prendergast
Assistant State Public Defender
250 East Broad Street, Suite 1400
Columbus, Ohio 43215

JUDGES:

Hon. Gene Donofrio
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

Dated: June 4, 2010

[Cite as *State v. Rupp*, 2010-Ohio-2532.]
DONOFRIO, J.

{¶1} Petitioner-appellant Forrest Rupp appeals the denial of his postconviction relief petition by the Mahoning County Common Pleas Court. A jury convicted Rupp of rape and the court sentenced him to a maximum ten-year term of imprisonment. The crux of Rupp's argument below and on appeal is that he was denied effective assistance of trial counsel.

{¶2} On June 17, 2004, Rupp was indicted for two counts of rape in violation of R.C. 2907.02(A)(2), which entails engaging in sexual conduct with another by purposely compelling the other to submit by force or threat of force.[1] The indictment alleged that he raped D.F. on March 18, 2004, in Austintown, Ohio.

{¶3} On August 22, 2005, the jury trial commenced. Twenty-three-year-old D.F. testified that she was studying at the house of her classmate from Trumbull Business College, Amy Smiley. Amy lived on the west side of Youngstown with her two young children. D.F. had her eight-month-old daughter with her. D.F. testified that Amy told her that Rupp was on his way over, that he was a lady's man and that she should stay away from him. When Rupp arrived, D.F. observed that he was nice and good-looking. (Tr. 315). They showed each other their tattoos. (Tr. 318).

{¶4} When Amy's babysitter fell through, Rupp volunteered to go to Wal-Mart with D.F. and her daughter. (Tr. 318). D.F. followed Rupp to his sister's apartment in Austintown where he dropped off his vehicle. D.F. admitted that she let Rupp kiss her while sitting on a swing at Wal-Mart; however, when he put his hand on her knee, she removed it and advised him that she "was not like that." (Tr. 325, 372). Rupp then revealed various troubling facts about his life that made her so afraid of him that she was tempted to run away from him at the store. (Tr. 326, 372-373).

{¶5} For instance, he told her that he was on parole for helping Martin Kolisar (the well-known shooter of a bar patron and murderer of a Youngstown police officer) elude the police during the national manhunt. (Tr. 323) Furthermore, he disclosed that he had been in prison for shooting a convenience store clerk, that he

---

1. The underlying facts and procedural history of this case are taken nearly verbatim from this court's opinion addressing Rupp's direct appeal in *State v. Rupp*, 7th Dist. No. 05 MA 166, 2007-Ohio-1561.

was not sorry for doing it and that he would do it again. (Tr. 323, 325-326). D.F. also noted that when her vehicle passed a police officer, Rupp acted nervous and hurriedly put on his seatbelt. (Tr. 329).

{¶6} When she pulled into the apartment complex to drop Rupp off, he continually put his hand on her leg despite her repeatedly pushing it away and telling him that she was "not like that" and that she did not want to "do anything." (Tr. 330-333). She opined that it should have been understood from her actions and protestations that she did not consent to further gropings. (Tr. 334).

{¶7} D.F. stated that Rupp then put his hands up her shirt, but she removed his hands. (Tr. 334). She could not remember if he said anything besides asking her if he could "touch me just once" to which she responded, "no." (Tr. 335). When he started unbuttoning her clothes, she again removed his hands. However, he proceeded to put his hand down her pants. (Tr. 336-337).

{¶8} The defense notes that D.F. was 5′7″ tall and weighed 170 pounds apparently in response to any suggestion that Rupp could have lifted her over the console between bucket seats. (Tr. 338). However, D.F. admitted that she first pushed Rupp away when he grabbed her ribs and attempted to pull her over the console, but she soon complied when he asked her to get on top of him. She complied because she feared what Rupp would do to her due to his contemporaneous statements about his violent past and due to his refusal to abide by her physical and verbal protestations. (Tr. 339, 424-425, 428, 449-450). She also testified that Rupp is taller and stronger than her, which the jury could judge for themselves as well. (Tr. 338). She ended up sitting on his lap where he removed her pants in spite of her stop commands and pushing. (Tr. 339-340).

{¶9} Rupp then switched their positions, putting her on the bottom with the seat reclined so far that her head was almost touching the baby's car seat. (Tr. 340-341, 424). She disclosed that she did not yell because she did not want to wake her baby and did not want her baby to see her being raped. (Tr. 336-337, 378, 428). She testified that he did not expressly threaten her at any time during the incident. (Tr.

377, 450). However, she was in fear of aggressively fighting him. She attested that she did not kick, hit or use any physical violence because she was afraid of what Rupp would do to her. (Tr. 334, 338-339, 346, 403). D.F. stated, however, that throughout the encounter, she tried to push Rupp away from her and repeatedly pulled back and said no and stop to his advances. (Tr. 331-342, 403, 427).

**{¶10}** Still, Rupp pulled his pants down and engaged in vaginal intercourse with her. She disclosed that when he put his penis in her vagina, she again asked him to stop. (Tr. 341). She did not kiss him back during the sex act. (Tr. 342). D.F. started crying and was visibly upset. When Rupp stopped, she told him that he made her "feel like a whore." He responded that it would be okay, and he moved to the driver's seat. She was unsure if he ejaculated. (Tr. 342).

**{¶11}** D.F. then testified that Rupp pulled her roughly by the back of the neck and pushed her head down so she would perform oral sex on him. (Tr. 343-344). She asked him to stop to no avail. (Tr. 344). She unwillingly performed oral sex on him for two to five minutes. (Tr. 345, 445). He did not ejaculate. He then instructed her to kiss his tattooed penis goodbye. (Tr. 345).

**{¶12}** D.F. testified that she did not call the police because she was afraid that Rupp would come after Amy and Amy's children. This belief was induced by arguments that occurred between Rupp and Amy that night after Rupp followed D.F., called her, instructed her to pull over, yelled at her for crying on the phone to Amy, grabbed the phone off her and followed her again. (Tr. 348-358). She stated that Rupp indirectly threatened her about going to the police. (Tr. 430-431).

**{¶13}** The incident occurred late Thursday night. On Saturday, D.F. received a telephone call at work from someone named Kim claiming to be Rupp's parole officer. (Tr. 359-360). This person advised that Rupp informed her of the allegations. This person asked why D.F. did not scream or yell if the encounter was not consensual. (Tr. 361). D.F. called the APA on Monday and asked for Rupp's parole officer named Kim. She was connected with Rupp's actual parole officer, a man named John Granger. (Tr. 362). She eventually told him her story, which started the

investigation in this case.

**{¶14}** On Tuesday, D.F. went to the emergency room. On Wednesday, the parole officer took her statement in person. On Thursday, the parole officer arrested Rupp, and D.F. gave a statement to the Austintown police. It was brought out at trial that none of her statements mentioned that Rupp told her about his past. (Tr. 417). She denied that she learned about his past from Amy prior to leaving the house with Rupp. (Tr. 453).

**{¶15}** However, Amy put in her statement and testified for the state that she told D.F. what she knew about Rupp before he arrived at her house that evening. (Tr. 477). She thought that she disclosed Rupp's criminal past and his lack of respect for women in that he tries to have sex with everyone. (Tr. 480, 500). Amy testified that she begged D.F. not to go with Rupp and opined that D.F. was very naive. (Tr. 480). Amy then related that when D.F. arrived back at her house, she was crying and stating that Rupp would not get off of her despite her telling him no. (Tr. 490-491).

**{¶16}** Lastly, Rupp's parole officer testified as to how he received the phone call from D.F. and how he took her statement. (Tr. 523-527). He revealed that he arrested Rupp because the allegations constituted a parole violation. (Tr. 528). He also said that he encouraged D.F. to go to the police and that she was willing to testify at the parole violation hearings. (Tr. 528-529).

**{¶17}** In closing, the state urged that Rupp should be convicted of two counts of rape, one for the vaginal penetration and one for the oral sex. (Tr. 544). The state also urged that the essential question was whether Rupp overcame D.F.'s will by fear or duress from which they could infer a threat of force, and the court instructed accordingly. (Tr. 597). The defense objected to this instruction.

**{¶18}** On August 26, 2005, the jury returned a guilty verdict on count two but could not come to an agreement on count one. Thus, a conviction was entered on count two, and a mistrial was declared on count one. On August 30, 2005, Rupp was then sentenced to ten years in prison and labeled a sexually oriented offender. Rupp appealed setting forth seven assignments of error: (1) insufficient evidence; (2)

improper jury instructions; (3) inadmissible other acts evidence; (4) inadmissible hearsay evidence; (5) prosecutorial misconduct; (6) speedy trial violation; and (7) cumulative error. This court rejected each of those arguments and affirmed Rupp's conviction. *State v. Rupp*, 7th Dist. No. 05 MA 166, 2007-Ohio-1561, appeal not allowed by 114 Ohio St.3d 1512, 872 N.E.2d 953, 2007-Ohio-4285.

**{¶19}** During the pendency of his direct appeal, Rupp filed a petition for postconviction relief in the trial court setting forth one claim – ineffective assistance of trial counsel. Rupp alleged that his trial counsel was ineffective for failing to adequately investigate the case and call two witnesses who he believes would have damaged his accuser's credibility and for advising him not to testify in his own defense. The court held an evidentiary hearing and, on June 18, 2008, denied the petition. Rupp appealed and this court, by agreement of the parties, remanded the case to the trial court with instructions to make a more detailed findings of fact and conclusions of law.

**{¶20}** On August 6, 2008, the trial court issued an amended judgment entry again denying the petition. The trial court reasoned that one of the witnesses' testimony would have been duplicative and the other would have constituted inadmissible hearsay. Furthermore, the court found that trial counsel's decision not to call the witnesses was a tactical decision which is given deference and presumed competent. Concerning Rupp's argument that his trial counsel was ineffective for advising him not to testify at trial, the trial court reasoned again that it was a tactical decision and that Rupp never took any overt action to bring to the court's attention his desire to testify. This appeal followed.

**{¶21}** Rupp raises two assignments of error. They are sufficiently similar that they can be addressed together. They state, respectively:

**{¶22}** "Mr. Rupp was denied his state and federal constitutional rights at trial, and the trial court erred when it denied Mr. Rupp postconviction relief. (July 24, 2008 Judgment Entry)."

**{¶23}** "Petitioner Forrest Rupp was deprived of his right to the effective

assistance of trial counsel under the Ohio and United States Constitutions when trial counsel failed to present a defense, despite having subpoenaed crucial defense witnesses to testify on Mr. Rupp's behalf."

**{¶24}** Rupp argues that his trial counsel was ineffective for failing to fully investigate the case, discuss the case more thoroughly with defense witnesses, and to present a defense including those witnesses. In terms of prejudice, Rupp points to the fact that the jury deliberated over ten hours and was unable to reach a verdict on one of the two counts.

**{¶25}** Rupp argues that his trial counsel subpoenaed, but failed to call to testify, two witnesses who would have attacked D.F.'s and Amy's credibility or impeached their testimony. The first is Jacob Kuzan (Kuzan) who was also a friend of Amy's and was at her apartment that night. After leaving Rupp at his apartment but before she returned to Amy's apartment, D.F. called Amy. She did not tell Amy about the rape, but Amy claimed that the victim sounded scared and was screaming and yelling over the phone. Instead, Rupp claims that Kuzan described a different scene. Kuzan testified that while Amy was talking with D.F. on the phone he overhead Amy exclaim, "Don't tell me you had sex with him?" (06/18/2008 Postconviction Evidentiary Hearing Tr. 9, hereinafter P.C. Tr. 9.) When D.F. and Rupp returned to Amy's apartment and Amy told Kuzan to take Rupp home, Kuzan dismissed Amy's reaction as her just being "dramatic." (P.C. Tr. 8.)

**{¶26}** A day or two following the incident, Kuzan was again at Amy's apartment when she was on the phone with D.F.. Amy put Kuzan on the phone with D.F. so that she could tell him what happened with Rupp. (P.C. Tr. 10.) Although unable to recall the particulars of the conversation, Kuzan testified that he specifically remembered D.F. admitting to him that she had not been raped. (P.C. Tr. 10.) Rupp contends that this would damage D.F.'s credibility because she denied having the phone conversation with Kuzan on cross-examination, but on redirect remembered the conversation and denied she told him that she had not been raped. (Trial Tr. 395-296, 440.)

**{¶27}** Rupp also maintains that Kuzan would have testified at trial that when he and Kuzan left Amy's apartment, he told him that he thought he could see things progressing with D.F. and that he seemed normal and was not nervous, confused, or angry. (P.C. Tr. 11-12.)

**{¶28}** The second witness that Rupp alleges his counsel failed to call to testify is Bill Markovich (Markovich). Markovich knew Rupp. When he went to the parking lot to retrieve his wallet, he observed Rupp and D.F. engaged in intercourse in the car. Rupp contends that Markovich's description of what he saw contrasted with that of D.F.'s. Because the rape occurred in such a "public" place, Rupp argues that his counsel should have investigated the matter further to determine if there were other witnesses who observed Rupp and D.F. in her car.

**{¶29}** Lastly, Rupp asserts that he wanted to testify at trial to tell his side of the story. He states that he was not concerned about his criminal history because the state had already exposed that to the jury and that if he would have testified he could have explained the circumstances under which he obtained those convictions.

**{¶30}** To prove an allegation of ineffective assistance of counsel, a petitioner must satisfy a two-prong test: (1) counsel's performance fell below an objective standard of reasonable representation and (2) resulting prejudice. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. Deficient performance means counsel's errors were so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *State v. Calhoun* (1999), 86 Ohio St.3d 279, 289, 714 N.E.2d 905, citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. To show deficient performance prejudiced the defense, the defendant must prove that, but for counsel's errors, the result of the trial would have been different. *Bradley,* 42 Ohio St.3d at paragraph three of the syllabus.

**{¶31}** When presenting an ineffective assistance of counsel claim, the petitioner has a difficult burden to overcome since in Ohio counsel is *presumed* to be

competent. *Calhoun*, 86 Ohio St.3d at 289, 714 N.E.2d 905. "There is a wide range of reasonable professional assistance, and the challenged action is typically presumed to be sound trial strategy." *State v. Drummond*, 7th Dist. No. 05 MA 197, 2006-Ohio-7078, at ¶16, citing *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

**{¶32}** Ultimately, a trial court's decision granting or denying a petition for postconviction relief "should be upheld absent an abuse of discretion; a reviewing court should not overrule the trial court's finding on a petition for postconviction relief that is supported by competent and credible evidence." *State v. Gondor,* 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, at ¶58.

**{¶33}** In this case, it does not appear that Rupp's trial counsel was ineffective. Although Rupp believes Kuzan and Markovich would have damaged D.F.'s and Amy's credibility, Kuzan and Markovich each had credibility issues of their own. Kuzan has convictions for drug abuse and drug paraphernalia and Markovich has a conviction for aggravated robbery. (P.C. Tr. 14, 34.) It is not clear whether Rupp's trial counsel was aware of these convictions.

**{¶34}** As it relates to Kuzan's testimony, the issue of whether D.F. denied that the rape occurred to Kuzan was sufficiently addressed at trial. Rupp's trial counsel questioned D.F.:

**{¶35}** "Q     You had a telephone conversation with Jake [Kuzan] a couple of days after March 18th, 2005, didn't you?

**{¶36}** "A     I don't remember that conversation.

**{¶37}** "Q     Okay.  You don't ever remember talking to Jake over the telephone?

**{¶38}** "A     No." (Trial Tr. 396-397.)

**{¶39}** Later, D.F. recalled the conversation:

**{¶40}** "Q     Do you remember telling the detective that you had a phone conversation with Jake Kuzan and that he advised you just to drop it?

**{¶41}** "A     Yes.

**{¶42}** "Q     Okay.  Do you remember that phone conversation now?

**{¶43}** "A     I do, but I can't remember everything that was said.

**{¶44}** "* * *

**{¶45}** "Q     * * * Did you ever tell Jacob Kuzan that you weren't raped?

**{¶46}** "A     No." (Trial Tr. 439-440.)

**{¶47}** Thus, the jurors were aware that D.F. may have denied that a rape occurred to Kuzan.  As for the phone conversation Kuzan overheard between D.F. and Amy shortly after the rape, Kuzan's characterization of that conversation would not have done anything to help Rupp's case.  Even if Amy had exclaimed "You didn't have sex with him did you?" to D.F., that would not have carried much import.  The jurors heard testimony from Amy herself that she told D.F. what she knew about Rupp and his criminal past before he arrived at the apartment that evening.  Furthermore, even if D.F. had denied that the rape occurred to Amy in that phone conversation, there was plenty of evidence that D.F. was not the "most forthcoming victim-witness." *State v. Rupp*, 7th Dist. No. 05 MA 166, 2007-Ohio-1561, at ¶55.

**{¶48}** Markovich's testimony would have been even less helpful.  At the evidentiary hearing, Markovich testified that he observed Rupp and D.F. having sex in the car when he went to the parking lot for his wallet.  Although not stated expressly, Rupp's implicit assertion is that Markovich's testimony would have provided evidence that the sex was consensual.  But, all Markovich was witness to was a sex act.  As this court stressed in Rupp's direct appeal, "force or threat of force can be inferred where the defendant purposely compelled the victim to submit by employing certain objective actions that can be found to overcome the will of the victim by fear or duress." Id. at ¶43. In addition to some evidence that Rupp used actual force by ignoring D.F.'s protestations, there was sufficient evidence in this case to prove that Rupp had overcome D.F.'s will by saying things to her that put her in fear.  Also, this court noted that "D.F. was not required to exit her vehicle to escape, especially where her baby was strapped into a car seat in the back seat." Id. at ¶55.  Markovich was not a witness to the actions that Rupp used to overcome

D.F.'s will.

**{¶49}** Lastly, we turn to Rupp's claim that his counsel was ineffective for advising him not to testify. A criminal defendant has a fundamental right to testify on his own behalf if he wishes. *State v. Bey* (1999), 85 Ohio St.3d 487, 499, 709 N.E.2d 484. However, the right is waivable and the decision of whether to have the defendant testify is also an important "tactical decision." Id. It is well recognized that the decision remains within the purview of trial strategy. *State v. Carpenter,* 6th Dist. No. E-00-033, 2002-Ohio-2266, ¶ 68; *State v. Mabry* (Oct. 9, 1996), 9th Dist. No. 2514-M. The advice provided by a criminal defense lawyer to their client regarding the decision to testify has been characterized as "a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance." *State v. Winchester,* 8th Dist. No. 79739, 2002-Ohio-2130, ¶12. Additionally, the right to testify on one's own behalf must be juxtaposed with the right against self-incrimination. As this court has observed, "[w]ithout any indication in the record to the contrary, we must assume that appellant knowingly exercised his privilege against self-incrimination." *State v. Carter* (1996), 115 Ohio App.3d 770, 776, 686 N.E.2d 329 (7th Dist.). As the trial court observed in this case, there is no indication that Rupp brought his desire to testify to the trial court's attention.

**{¶50}** In sum, Kuzan and Markovich's questionable testimony would have added little to Rupp's defense and their credibility could have easily been attacked. Rupp's trial counsel thoroughly cross-examined D.F. and effectively attempted to attack her credibility. But ultimately, the final credibility determination remained with the jury. Much of Kuzan and Markovich's testimony would have been duplicative of what Rupp's counsel achieved at trial without them. The decision whether to call a witness, including the defendant himself as a witness, "falls within the purview of trial tactics and, therefore, is not subject to second-guessing by an appellate court." *State v. Taravella*, 7th Dist. No. 02 HA 542, 2003-Ohio-4880, at ¶31. Furthermore, Rupp never notified the trial court of his desire to testify. Rupp's trial counsel's decisions did not amount to anything more than tactical or strategy, and did not amount to

ineffectiveness of counsel.

**{¶51}** Accordingly, Rupp's first and second assignments of error are without merit.

**{¶52}** The judgment of the trial court is hereby affirmed.

Waite, J., concurs.

DeGenaro, J., concurs.